**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Margarito Juan ALVAREZ,
Defendant-Appellant.**

No. 76–1689.

United States Court of Appeals,
Fifth Circuit.

March 10, 1977.

Rehearing Denied April 6, 1977.

Richard H. Garcia, Ramon Garcia, Edinburg, Tex., for defendant-appellant.

Edward B. McDonough, Jr., U. S. Atty., Mary L. Sinderson, George A. Kelt, Jr., Charles E. Lewis, James R. Gough, Asst. U.

S. Attys., Houston, Tex., for plaintiff-appellee.

Before GEWIN, GEE and FAY, Circuit Judges.

GEE, Circuit Judge:

Margarito Juan Alvarez was convicted of conspiracy to possess, and possession of, marijuana with intent to distribute in violation of 21 U.S.C. §§ 846, 841(a)(1) (1970) and 18 U.S.C. § 2 (1970). On appeal, he asserts that his convictions are not supported by sufficient proper evidence.

On the night of September 25, 1975, two customs patrol officers conducting a surveillance of the Rio Grande River near Rio Grande City, Texas, observed two men pulling a boat loaded with sacks across the river. When the boat landed on the Texas side, five more men emerged from the bank, and the unloading operation began. One of the officers threw a ground illumination flare and ran and seized one Israel Villareal; as the men scattered, the second officer chased a short, stocky man up the bank, past a parked white Chevrolet van where the stocky man dropped two sacks and toward a group of houses, the closest of which was owned by Alvarez' father. The stocky man won the race, and the officer, having lost sight of him, returned to the van and found sacks of marijuana inside it and scattered along the path from the van to the river bank. Villareal, the Chevrolet van and approximately 1,600 pounds of marijuana were taken to the Customs Patrol Office in Rio Grande City.

Interrogation of Villareal in Spanish and English at the Customs Patrol Office by two Drug Enforcement Administration agents resulted in a statement given by him which became the subject of considerable controversy at trial. According to the agents, Villareal identified Margarito Alvarez as the owner of the white van and, further, as the stocky man who fled from the bank toward the houses. According to Villareal, on the other hand, he told the agents only that the van belonged to Margarito Alvarez (as he knew from servicing it at a truck stop where he worked) and did *not* say that Margarito was present at the riverbank.[1] Two days later an arrest warrant was served on Alvarez at his home.[2]

At trial, the prosecution called Villareal to testify and, when he persisted in denying having placed Margarito at the river, called the interrogating agents to impeach Villareal by testifying as to his statement at the Customs Patrol Office.[3] The jury was instructed to consider the agents' testimony only in evaluating Villareal's credibility and not as evidence of Alvarez' guilt. With that instruction in mind, we will consider the remainder of the evidence against Alvarez in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), to determine whether

1. Villareal persisted in his version of the interrogation even after he was arraigned and pled guilty to one count of a three-count indictment, was warned by the court of the consequences of perjury, and was given the maximum possible sentence. The trial court, after accepting Villareal's guilty plea, raised Alvarez' bond, "Because I find that this man [Alvarez] is getting a 19-year-old boy [Villareal] to lie for him." Indeed, we were informed by the Assistant United States Attorney on oral argument that Villareal has been convicted of perjury.

2. The government points to Margarito's conduct at his arrest as an indicator of "guilty knowledge" on his part. The warrant was served by two officers, one in uniform and one out of uniform. Confronted by an officer, Mar-

garito's wife claimed that he was not at home; when confronted by the officer in a back room, Margarito identified himself as Ricardo Garza. Margarito's father-in-law later identified him to the officers. Margarito testified that he was confused and afraid when approached by an officer with a "gun in sight," but he was unable to remember whether or not the officer had a uniform on. An officer testified that it was the uniformed one who confronted Alvarez.

3. This trial having taken place after the Federal Rules of Evidence took effect on July 1, 1975, Alvarez' claim that the prosecution should not have been allowed to impeach its own witness is foreclosed by Rule 607.

either of his convictions can be sustained.[4] We note first that the existence of a conspiracy has certainly been established—that the presence of seven men working under cover of darkness on the banks of the Rio Grande to unload 1,600 pounds of marijuana which was floated across the river "is sufficient to show a concert of action, all parties working together understandingly, with a single design . . . ." *United States v. Prout*, 526 F.2d 380, 385 (5th Cir. 1976). Thus, at first blush, it *might* appear that in reviewing Alvarez' conviction on the conspiracy count we should concern ourselves only with searching for the "slight evidence" required on appellate review to connect a person with an existing conspiracy, *United States v. Nicholson*, 525 F.2d 1233, 1237 (5th Cir. 1976), including, at the least, some showing of Alvarez' knowledge of the conspiracy's purpose and some action indicating his participation therein. *Miller v. United States*, 382 F.2d 583, 586 (9th Cir. 1967), *cert. denied*, 390 U.S. 984, 88 S.Ct. 1108, 19 L.Ed.2d 1285 (1968). Mature reflection has convinced us, however, that the "slight evidence" rule is of doubtful application to the state of facts presented here, where the issue for review is whether Alvarez was connected with the demonstrated conspiracy *at all*. It being of the nature of a conspiracy to conceal itself, the "slight evidence" rule finds its proper application where persons are clearly connected to the conspiring group or are found acting in such a manner as unmistakably to forward its purposes. In such instances, given the clandestine character of such projects, slight additional evidence suffices to base an inference that one who had been shown beyond reasonable doubt to be a participant was as well a *knowing* participant. But where, as here, the question is whether a defendant was connected with the conspir-

acy at all, to apply such a rule is to risk convicting him of the crime itself upon "slight evidence." We conclude that Alvarez' presence at the river must be established by evidence which a jury could conclude rules out any reasonable hypothesis of innocence. *Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 99 L.Ed. 150 (1955). Once presence is so established, as to his knowing participation, the "slight evidence" rule may have its day. Since much the same evidence, if it exists in the record, would tend to establish both Alvarez' connection with the conspiracy and his possession, actual or constructive,[5] of the contraband, we will consider the evidence as it relates to both counts simultaneously.

■ The evidence tending to indicate Alvarez' guilt is as follows: the white van had recently been purchased in the name of "Alvarez Brothers," an informal trucking partnership composed of Margarito and several of his seven brothers; testimony indicated that Margarito was the unofficial leader of the partnership, and his signature appeared on the seller-donor certificate for Alvarez Brothers. Apparently Margarito also drove the truck more often than any of his brothers, but he testified that several of the brothers chipped in to buy it and that he always left the keys in it so that any of the brothers could use it.[6] The closest house to the riverbank at the crossing point belonged to the father of Margarito Alvarez and because of fences running perpendicular to the river, the sole vehicular access to the place where the van was parked was through the Alvarez property. Margarito is short and stocky and is the only one of the Alvarez brothers who is short and stocky. Thus, if the fleeing man were one of the Alvarez brothers, he would have to be Margarito in order to fit the agent's description. Added to the foregoing was

---

4. Alvarez received concurrent sentences, and thus our inquiry ends if we find sufficient evidence to support the jury's verdict on either count. *Mishan v. United States*, 345 F.2d 790, 791 (5th Cir. 1965).

5. Constructive or actual possession is shown by "dominion and control over the item or at least a power to exercise dominion or control."

*United States v. Phillips*, 496 F.2d 1395, 1397 (5th Cir. 1974), *cert. denied*, 422 U.S. 1056, 95 S.Ct. 2680, 45 L.Ed.2d 709 (1975).

6. Without contradiction, although the prosecutor in cross-examining him attempted to cast doubt on the likelihood of his routinely leaving the keys in the truck.

certain evidence that could be expected to look suspicious to a jury: Alvarez' initial lying about his identity when arrested, his somewhat dubious alibi testimony,[7] and the fact that Israel Villareal worked at a truck stop owned by someone related to Margarito.[8]

Disregarding Villareal's conflicting statements entirely, from these facts the jury was entitled to draw some very far-reaching inferences indeed. They were, as an example, authorized to conclude that since the van was properly available only to an Alvarez brother, and since it would have been strange indeed for any interloper who purloined it to have promptly driven it into the yard of Alvarez *père*, it was one of the Alvarez brothers who took it to the river on the fatal day. Margarito being the only stocky brother, they could conclude as well that the stocky man who outran the officer was, if a brother, Margarito. To this already-laden pan of the scales, they might also add that Margarito—the leading figure in the partnership which owned the van— usually had custody of it and that none of the other brother-partners came forward at trial to assert that he had the van at the time, that it had been commandeered by an interloper, or anything else of the sort.

In another vein, the jury might well have determined that Margarito's dubious alibi was untrue and from this have inferred that at the time of the foot-race he was either there, on the riverbank, or somewhere else that he was unwilling to own up to.

Finally, there remains the incident in which Margarito attempted to avoid arrest. The jury was entitled to believe, as to this, that it was indeed the uniformed officer who sought him at his home that day and that both Margarito and his wife preferred a claim that a stranger was in the back room of his house to an acknowledgment of his true identity.

It cannot be gainsaid that convictions on circumstantial evidence never leave the mind entirely satisfied or at rest. But in view of the above obvious and major permissible inferences from the evidence, we find ourselves unable to fault the jury. They could properly have concluded that the likelihood of Margarito's being elsewhere than on the riverbank that night was too slim to be troubling. His conviction is therefore AFFIRMED.

---

**7.** Alvarez testified, with some support from other witnesses, that on the afternoon and night of September 25 he went first to a family party and then to the La Posta Bar to drink beer with some friends. Among the witnesses supporting his alibi testimony was the bartender of La Posta, who brought a credit tab dated 9/25/75 in Margarito's name. The number on the tab appeared to be out of sequence with other credit tabs made out on dates around the 25th, and the bill was for $19.50—indicating (with La Posta beer going for 50 cents per glass) a hefty 39 beers drunk by four persons of an evening. Further testimony showed that the La Posta Bar was owned by a member of the Alvarez family—a cousin, according Margarito, or the Alvarez brothers themselves, according to Margarito's wife.

**8.** Testimony with respect to the El Cuehote Truck Stop was similar to that which related to the La Posta Bar. Margarito's wife testified that the Alvarez brothers had an interest in the El Cuehote; Margarito testified that it was owned by someone named Alvarez but that he didn't know *which* Alvarez. A jury might well have thought it strange that Margarito's wife knew he owned an interest in the truck stop but he did not.