**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Ubaldo TREVINO and Ramiro Gonzalez, Defendants-Appellants.**

**No. 76–2611.**

United States Court of Appeals, Fifth Circuit.

Aug. 3, 1977.

Rehearing and Rehearing En Banc Denied Oct. 11, 1977.

---

2. *See Chappell v. Goltsman*, 197 F.2d 837 (CA5, 1952).

Brendan J. Hall, Jr., Abel Toscano, Jr., Harlingen, Tex., for Gonzalez.

Frank Maloney, Kenneth E. Houp, Jr., Austin, Tex., for Trevino.

Edward B. McDonough, Jr., U.S. Atty., Mary L. Sinderson, George A. Kelt, Jr., Robert Berg, James R. Gough, Asst. U.S. Attys., Houston, Tex., for plaintiff-appellee.

Before GODBOLD, SIMPSON and GEE, Circuit Judges.

GEE, Circuit Judge:

Ubaldo Trevino and Ramiro Gonzalez were tried before a jury for conspiracy to possess and possession of marijuana with intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(a)(1) (1970), and 18 U.S.C. § 2 (1970). Each was convicted on both counts and sentenced to serve two consecutive five-year terms, with two-year special parole terms, and fined $7,500 on each count. On this appeal they complain of the sufficiency of the evidence to support their convictions, denial of access to the presentence report of the government's chief witness, and deletion of parts of that witness' grand jury testimony in making the transcript available to them. Finding no errors requiring reversal, we affirm.

## I. *Sufficiency of the Evidence*

Prosecution of appellants was made possible by the decision to "sing" of one Amador Leos Gonzales (Leos), a Mexican national who was arrested on the night of October 9, 1974, while driving a 2½ ton stakebed truck loaded with 2,156 pounds of marijuana in sacks. Leos invoked his constitutional rights and declined to implicate anyone until some time after his conviction of possession of marijuana.[1] Then he began to tell his story, first to Drug Enforcement Administration (DEA) agents and then to the federal grand jury which indicted appellants. At trial Leos, speaking through an interpreter, told of being in McAllen, Texas, on October 9 on a one-day shopping tour from his home in Reynosa when three men[2] approached him with a request to guide them around Reynosa. Agreeing, Leos got into a car with the men and was driven instead to a car lot in McAllen. The three men entered a small building on the lot and

---

1. Leos pleaded guilty immediately after his motion to suppress was denied. No bargain was struck to gain his testimony.

2. Leos' testimony was sometimes confusing, perhaps due to the need for the interpreter, but these men apparently included two Anglos and one Mexican-American or Mexican national who conversed with Leos in Spanish. Appellants were not accompanying the three men at this time.

were joined inside by appellants, who drove up together in a cream-colored Cadillac; Leos waited outside. After a short time six men emerged from the building; appellants and a gray-haired man drove away in the Cadillac, followed by Leos and his three accosters in their car. The procession next stopped at Madero, a village near Mission, Texas, where appellant Gonzalez owned some property. Here Leos first saw the truck which he was ultimately to drive. Further discussion took place in English—which, of course, Leos could not understand—and then both Gonzalez and Trevino approached Leos and asked him if he could drive a truck. Since Leos had never driven a truck, Gonzalez sketched the gearshift pattern in the sand for him. Gonzalez, in Trevino's presence, offered Leos $500 to drive the truck; Trevino said something about "joining them" or "going in with them." Leos and the three men who had originally approached him got back in their car and drove away; the gray-haired man drove the truck, and appellants Trevino and Gonzalez left in the Cadillac in another direction. The next stopping point was a rural location near the river; Trevino and Gonzalez were absent and the truck was now loaded, and Leos was told for the first time that his load was marijuana. He drove away in the truck alone and had navigated only a short distance toward his destination (a highway underpass a few miles away) when he was stopped and arrested by DEA agents alerted to his approach by electronic sensors.[3]

### A. Conspiracy

■ As this court has stated, the minimum elements of a conspiracy are an agreement by two or more persons to work together for an illegal purpose and the commission of some overt act in furtherance of that purpose by one conspirator. *United States v. Warner,* 441 F.2d 821, 830 (5th Cir. 1971). Since illicit agreements usually are made in secret, proof of the mutual purpose normally rests upon "inferences drawn

from relevant and competent circumstantial evidence . . .." *Id.* Here, we have direct evidence—Leos' testimony—of two covert meetings of six men followed by a third rendezvous at which four of the men turned over to him, an acquaintance of about four hours, a late-model truck laden with a ton of marijuana. The jury was certainly permitted to infer the existence of a conspiracy from these underlying facts.

■ With the conspiracy thus established, the question for the jury would become the participation *vel non* of appellants. Given the guilty verdict, our starting point is the requirement of *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), that we consider the evidence in the light most favorable to the government. Further, the cases are legion that only slight evidence is required on appellate review to connect an individual with a proven conspiracy. *See, e. g., United States v. Nicholson,* 525 F.2d 1233, 1237 (5th Cir. 1976). In a recent review of this "slight evidence" rule we explicated its scope slightly, noting it is properly applicable only when the defendants are "clearly connected to the conspiring group or are found acting in such a manner as unmistakably to forward its purposes. In such instances . . . slight additional evidence suffices to base an inference that one who had been shown beyond reasonable doubt to be a participant was as well a *knowing* participant." *United States v. Alvarez,* 548 F.2d 542, 544 (5th Cir. 1977) (emphasis in original). Here, direct testimony by Leos established appellants' "presence" with other conspirators; his description of their involvement in two meetings immediately before the turnover of the load was sufficient to show that appellants were "clearly connected to the conspiring group . . . .." *Id.* This hurdle cleared, we move forward and find considerably more than the "slight evidence" required to show that Trevino and Gonzalez were active, knowing participants in the conspiracy.

---

**3.** The agents drove the truck on to the underpass delivery point described by Leos and withdrew into the shadows for surveillance, but by

this time the delivery was two hours late, and no one came.

■ Much can be inferred, for example, from the covert nature of the two meetings at which appellants were present, and their proximity in time to the third and final meeting at which four of the men (*sans* Trevino and Gonzalez) entrusted a ton of marijuana to Leos, but appellants indicated much more by their entreaties to Leos. Both Trevino and Gonzalez asked Leos if he could drive the truck, and Gonzalez showed him the gearshift pattern. While this query is not necessarily inconsistent with an innocent transaction, Gonzalez' offer of $500 for what was to be a trip of a few miles provided a strong manifestation of his knowledge that unlawful activity was afoot. Trevino was standing by when this offer was made and immediately asked Leos to "join" or "go in with" the group. The jury was also entitled to consider the testimony of DEA Agent Rodriguez that drug traffickers near the border commonly minimize the danger to themselves by employing "mules," poor people who need money and can be recruited for $500 or $600 for a single haul of contraband north from the border. The inference is compelling indeed that Trevino and Gonzalez knew the nature of the activity in which their cohorts were engaged and affirmatively sought to bring it to fruition. Perhaps the jury could have found that, as Gonzalez suggested in oral argument, Trevino and Gonzalez simply arranged a sale or lease of the truck contingent on finding a driver, but certainly they were not required to so find.[4] The evidence supports the conspiracy convictions.

### B. *Possession*

■ Trevino and Gonzalez were charged in this count under 21 U.S.C. § 841(a)(1) (1976), making illegal any possession of a controlled substance with intent to distribute, and 18 U.S.C. § 2 (1970), providing that "whoever . . . aids, abets, counsels, commands, induces or procures" the commission of a federal crime is punishable as a principal for the violation itself. To aid or abet another in the commission of a crime within the meaning of the statute requires that the defendant "in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, that he seek by his action to make it succeed." *Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919, 925 (1949); *Moore v. United States,* 356 F.2d 39, 43 (5th Cir. 1966). Much of the same evidence which establishes appellants' participation in the conspiracy also supports a finding that they aided and abetted Leos in the possession for which he was convicted. At a time when Leos still apparently thought he was to serve as a guide in Reynosa, Trevino and Gonzalez were the first to mention the truck and ask if he could drive it; Gonzalez, with Trevino's tacit assent, offered money that a poor man might find it hard to refuse and demonstrated the gearshift pattern; Trevino entreated Leos to come aboard. None of this would be sufficient to support an aiding and abetting conviction were we to find that appellants did not know the purpose for which the truck was being used, but we have already noted the considerable indications that appellants were aware of the illicit purpose.

The evidence is sufficient to support the convictions on the possession count.[5]

4. Appellants would have us reverse on the authority of, *e. g., Roberts v. United States,* 416 F.2d 1216, 1220 (5th Cir. 1969), holding that "neither association with conspirators nor knowledge of illegal activity constitute proof of participation in a conspiracy." Our affirmance here portends no quarrel with *Roberts*; by their active solicitation of Leos and other actions indicating solidarity with the conspiracy, appellants illustrated more than mere "association" or "knowledge of illegal activity."

5. Our treatment of the possession question under the aiding and abetting statute removes the necessity for considering *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), cited by the United States in its brief and noted by both sides on oral argument. The *Pinkerton* rationale holds one who knowingly joins a conspiracy responsible for all acts committed within the scope of the agreement by any of the conspirators, so long as he has done nothing to disavow or defeat the purpose. The jury in this case was not given a *Pinkerton* charge but rather was instructed concerning aiding and abetting, an "equally valid" and independent theory, *Nye & Nissen v. United*

## II. *Denial of Access to Leos'*
## *Presentence Report*

A great deal of the trial defense was devoted to attacking the credibility of Leos, without whose testimony the prosecution would not have had a case. Before trial, in an effort to gain material for impeachment, both appellants unsuccessfully moved for discovery of the presentence report compiled by the probation officer after Leos' guilty plea.[6] Although appellants' motions were not models of clarity and specificity, we will treat them as having raised the question of discovery of the report under three possible authorities: *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); the Jencks Act, 18 U.S.C.A. § 3500 (Supp.1976); and Rule 16, Fed.R. Crim.P. Our reading of all three of these authorities as being directed toward evidence in the hands of the *prosecutor,* rather than those of a court or probation officer, persuades us that appellants were not entitled to see the report.

In *Brady,* the Supreme Court held that a defendant convicted of murder committed during a robbery was denied due process when the prosecutor withheld from him a statement by his companion admitting that he, and not Brady, had done the actual killing. The succinct holding was that "the suppression *by the prosecution* of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment . .." 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218 (emphasis added). The Jencks Act, 18 U.S.C. § 3500, requires the court upon motion after a witness has testified for the United States to order the United States to "produce any statement . . . of the witness *in the possession of the United States* which relates to the subject matter as to which the witness has testified." *Id.* § 3500(b) (emphasis added).

States, 336 U.S. 613, 618, 69 S.Ct. 766, 769, 93 L.Ed. 919, 925 (1949), and constructive possession. A verdict on the *Pinkerton* theory requires appropriate instructions to the jury on fact issues, *id.;* that theory thus is not before us on this appeal.

Rule 16(a)(1)(C) requires the government to permit the defendant to "inspect and copy . . . papers, documents . . . which are *within the possession, custody or control of the government,* and which are material to the preparation of his defense or are intended for use by the government as evidence in chief at the trial . . .." (emphasis added).

 Rule 32(c) shows that the presentence report is a report *to the court,* compiled for the court's use in the sentencing process. As amended in 1974, Rule 32(c)(3)(A) establishes a basic presumption that the defendant or his attorney is entitled to read his own presentence report, subject to certain exceptions and provisions for deletion of specifically enumerated items, but Rule 32(c)(3)(D) requires return of any copies of the report to the probation officer immediately after sentencing unless the court otherwise directs. Significantly, the prosecutor is not permitted to see any of the material in the report save those parts which are requested by and disclosed to the defendant. Rule 32(c)(3)(C). In short, a presentence report serves not as a prosecutorial tool but as an informative document for the guidance of the court.

*Brady* involved evidence available to and suppressed by the prosecution; its language is directed entirely to the proper role of the prosecutor in according the accused a fair trial:

A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice . ..

---

**6.** Such reports are required by Rule 32(c) of the Federal Rules of Criminal Procedure except under certain enumerated circumstances, and the defendant is normally invited by the reporting probation officer to give his version of the facts concerning the offense, though Rule 32 does not require that he do so.

373 U.S. at 87–88, 83 S.Ct. at 1197, 10 L.Ed.2d at 219. Nothing in the *Brady* opinion would encompass a report compiled in an earlier prosecution and held by the convicting court—which may or may not be the court in which the discovery motion is considered—through its probation service. We decline to extend *Brady's* reach by holding that a discovery motion addressed in effect to a court or its probation officer, rather than the prosecution, asking production of a witness' presentence report, must be granted under *Brady's* authority.[7] *See United States v. Walker,* 491 F.2d 236, 238 (9th Cir.), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974).

■ Appellants' Jencks Act contention is that the presentence report, being in the custody of the probation officer, is "in the possession of the United States" and thus subject to disclosure after the witness has testified to the extent that it contains "any statement . . . of the witness . . which relates to the subject matter as to which the witness has testified." 18 U.S.C.A. § 3500(b) (Supp.1976). Probation officers, serving by appointment of and under the direction of the district courts, are, in a broad sense, employees of the United States, but the term "United States" in § 3500 has a narrower meaning, as evidenced by § 3500(a), which states that the Act is applicable "[i]n any criminal prosecution *brought by the United States* . . ." (emphasis added). With that language we think the term "United States" is shown to mean the *prosecutorial* division of the government, at least within § 3500(a); that this interpretation should also apply to § 3500(b)'s use of the term "United States"

is evidenced by the differentiation within § 3500(b) between "the court," which on motion of the defendant is required to order production of the statement, and the "United States," for whom the witness has testified and to whom the production is directed. In sum, a "statement . . . in the possession of the United States" can only be read to mean a statement in the hands of the federal *prosecutor* ; a witness' presentence report held by the prosecution might thus be subject to Jencks Act production. Again, we need not decide that question. Here Leos' presentence report remained in the control of his probation officer, and § 3500 does not reach it.

■ Finally, we turn to Rule 16.[8] The appropriate subdivision is 16(a)(1)(C), which requires the "government" to permit inspection of certain items within its "possession, custody or control" which are material to the defense or intended for use as evidence. In this context it is the word "government" which, it is argued, should be interpreted broadly enough to cover courts or probation officers. As with the Jencks Act, however, the surrounding language of 16(a)(1)(C) requires a narrower reading; the subdivision refers, for example, to papers or documents "intended for use by the *government* as evidence in chief at the trial . . . ." Neither probation officers nor district judges being in the business of introducing evidence in chief at trial, this language tells us that "the government" means the defendant's adversary, the prosecution. Confirming this conclusion are the repeated references to "the attorney for the government" in 16(a)(1)(A), (B) and (D) and 16(a)(2). No more than *Brady* or the

---

**7.** By the same token we do not attempt to contract *Brady* by insulating such presentence reports entirely from discovery if the prosecution *does* have in its possession (pursuant to Rule 32(c)(3)(D) and the sentencing *court's* discretion) a witness' presentence report containing exculpatory material. In such instances Brady might well compel disclosure of relevant portions of the report. We are not faced here with a case for delineating *Brady's* scope in such a context.

**8.** We note that perhaps Rule 16 simply throws the question back to the Jencks Act and does

not constitute an independent authority under which to examine this request for production of the report. Subdivision (a)(2) states that the rule does not authorize discovery or inspection of "statements made by government witnesses. or prospective government witnesses except as provided in 18 U.S.C. § 3500." Because we find Rule 16 inapplicable to appellants' request on other grounds, we need not decide whether this subdivision might have ended our inquiry with our holding that § 3500 is inapplicable here.

Jencks Act did Rule 16 authorize disclosure of Leos' presentence report; the trial court was correct in overruling appellants' motions for production of the report.[9]

■ Our decision denying discovery of the presentence report of a government witness under *Brady,* the Jencks Act and Rule 16 is not to be read as a comprehensive survey of the boundaries of required disclosure under those provisions. We emphasize once more that neither the prosecutor nor any governmental unit aligned with him in the prosecution can have possession of or access to a presentence report except in limited circumstances unrelated to our discussion today.[10] Were we considering some type of report held by an arm of the government other than the probation officer—an investigative agency, for example—different questions would be presented, those concerning the prosecutor's duty to disclose material not technically within his possession but to which he has ready access. We have held, for example, that *Brady* required disclosure of the Post Office Department personnel file of a government witness employed by that agency, to which the prosecution did not deny having access, even though it lacked present physical possession. *United States v. Deutsch,* 475 F.2d 55, 57 (5th Cir. 1973). Other courts have held that investigative agencies' files were covered by the Jencks Act[11] or by Rule 16.[12] Certainly the prosecutor would not be allowed to avoid disclosure of evidence by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial; such evidence is plainly within his Rule 16 "control." On

the other hand, *Brady,* the Jencks Act and Rule 16 are each and all anti-withholding provisions, and the extent to which any may extend to matter unknown to the prosecutor is doubtful and must abide the event and case-by-case treatment.

### III. *Deletion of Grand Jury Testimony*

■ As amended in 1970, the Jencks Act definition of a "statement" of a witness includes the record of the witness' testimony to a grand jury. 18 U.S.C.A. § 3500(e)(3) (Supp.1976). Appellants moved on Jencks Act and *Brady* grounds for production of Leos' testimony to the grand jury which indicted them; following Jencks Act procedure, the court directed the government to supply appellants with the relevant portions of the grand jury transcript after Leos testified at trial. Portions of four of the thirty-nine pages of the transcript were deleted, however, when appellants received it. We find no error in the excisions. Initially, we disagree with appellants' contention that the trial court permitted the prosecuting attorney to make the deletions of supposedly irrelevant material rather than examining the transcript and making the deletions himself. The record indicates that the court took the transcript, read it, and directed that the applicable pages be copied and given to the appellants and that the copying of the transcript with excision of a few specific paragraphs was at the direction of the court. Further, we have examined the transcript of Leos' grand jury testimony in its entirety[13] and agree with the trial court that the few portions excised were not exculpatory within the *Brady* holding, nor did they "relate to

---

**9.** A panel of this court in an unpublished opinion has held that Rule 16 does not authorize discovery of the presentence report of a government informant:

> The presentence report is prepared for the use of the sentencing court. The possession, custody and control of the report remains with the court. We think that such report is not paper within the possession, custody or control of the government . . . .

*United States v. Cardenas,* 538 F.2d 898 (5th Cir., 1976) (per curiam).

**10.** *See* pages 1270–71, *ante.*

**11.** *See, e. g., Campbell v. United States,* 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961); *United States v. Dansker,* 537 F.2d 40 (3d Cir. 1976) (dictum); *United States v. Ehrlichman,* 389 F.Supp. 95 (D.D.C.1974) (dictum).

**12.** *See, e. g., United States v. Bryant,* 142 U.S. App.D.C. 132, 439 F.2d 642 (1971).

**13.** The transcript was provided for us at oral argument by the Assistant United States Attorney as required by § 3500(c).

the subject matter of the testimony" of Leos under § 3500(c). The court did not err in directing deletion of these portions.

Appellants' remaining complaints are without merit and are denied, and their convictions are AFFIRMED.

GODBOLD, Circuit Judge, concurring specially:

I concur in the result and in the majority opinion except for Part II, which relates to denial of access to the presentence report on Leos. The precise issue for decision is whether, under *Brady*, the Jencks Act, or Rule 16, appellants were entitled to discovery of this presentence report, compiled by and in the possession of the probation officer.

Part II states that *Brady*, the Jencks Act and Rule 16 are "directed toward evidence in the hands of the *prosecutor*"; that the term "United States" in the Jencks Act "mean[s] the *prosecutorial* division of the government" and that " 'a statement . . in the possession of the United States' can only be *read to mean a statement in the* hands of the federal *prosecutor*"; and that under Rule 16 "the government" means the prosecution. I assume that these statements are not intended to depart from established and more precisely stated standards. In *U. S. v. Dansker*, 537 F.2d 40 (CA3, 1976), the court, in holding that a presentence report was not discoverable under the Jencks Act, said: "In speaking of statements 'in the possession of the United States', we understand the statute to require production only of statements possessed by the prosecutorial arm of the federal government." 537 F.2d at 61. The court went on to note that the "prosecution" includes investigatory agencies as well as U. S. Attorneys when it said, "Hence, such statements possessed by, for example, the F.B.I. or a United States Attorney must be turned over to the defense on proper motion." *Id.* Moreover, the two cases relied on by the Third Circuit in *Dansker*, *Augenblick v. U. S.*, 377 F.2d 586, 597–98, 180 Ct.Cl. 131 (1967), *rev'd on other grounds* 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537

(1969), and *U. S. v. Erlichman*, 389 F.Supp. 95, 96 (D.D.C., 1974), both specifically point out that the Jencks Act contemplates disclosure by all executive investigatory agencies.

In the context of Rule 16 there are equally strong indications that "government" means more than just the prosecutor. In *U. S. v. Bryant*, 142 U.S.App.D.C. 132, 439 F.2d 642, 650 (1971), the court, speaking in terms of the Jencks Act, Rule 16 and *Brady*, said:

> The fact that it was the Bureau of Narcotics and Dangerous Drugs, and not the United States Attorney's office, which had possession of the tape in these cases does not render it any less discoverable. The duty of disclosure affects not only the prosecutor, but the Government as a whole, including its investigative agencies. Rule 16 and the Jencks Act refer, respectively, to evidence gathered by "the government" and by "the United States," not simply that held by the prosecution.

*Id.* at 650.

There is Fifth Circuit law as well. In *U. S. v. Deutsch*, 475 F.2d 55 (CA5, 1973), the appellants-defendants were accused of bribing a postal employee. Before trial, the defendants, pursuant to Rule 16, moved for production of the employee's personnel file, citing *Brady* as authority. The district court denied production, saying that the Post Office Department was not an "arm of the prosecution." We rejected the district court's position. Speaking in terms of a *Brady* duty to disclose, this court said that the government could not escape its obligation to supply evidence by compartmentalizing the Justice Department and the Post Office Department, and by claiming that the former organization did not have access to the requested materials merely because they were in the possession of the latter organization. 475 F.2d at 57.

In my judgment most of Part II is arguably dicta, certainly broader than necessary for the decision, and a source of future misunderstanding when read in the light of established jurisprudence.