**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jose Francisco RODARTE,
Defendant-Appellant.**

No. 78–5628
**Summary Calendar.***

United States Court of Appeals,
Fifth Circuit.

June 4, 1979.

---

* Rule 18, 5 Cir.;  *see Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al.,* 5 Cir., 1970, 431 F.2d 409, Part I.

Victor R. Arditti, Court-appointed, El Paso, Tex., for defendant-appellant.

Jamie C. Boyd, U. S. Atty., LeRoy Morgan Jahn, James W. Kerr, Jr., Asst. U. S. Attys., San Antonio, Tex., Janet Reusch, Asst. U. S. Atty., El Paso, Tex., for plaintiff-appellee.

Before COLEMAN, FAY and RUBIN, Circuit Judges.

PER CURIAM:

By a grand jury indictment filed in the United States District Court for the Western District of Texas, appellant Jose Francisco Rodarte was charged with conspiring with Edward Montelongo and Joseph Orosco to possess marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846, and with aiding and abetting the possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. From a jury trial resulting in conviction on both counts, Rodarte appeals.

Rodarte urges four grounds for reversal. First, Rodarte asserts that the evidence produced at trial was insufficient to sustain his conviction. Second, Rodarte argues that the trial court erred in not granting a mistrial when several police witnesses testified to matters not covered in the reports made available to appellant's attorney. Third, appellant contends that the trial courts admission of testimony concerning his prior arrest and conviction in Mexico was contrary to the Federal Rules of Evidence. Appellants final argument concerns the propriety of several statements made by the prosecutrix during her closing argument. For reasons more fully developed below, we affirm.

## FACTS

On December 27, 1977, Ronald Bain, a detective with the El Paso Police Department acting in an undercover capacity for the Drug Enforcement Administration (DEA) Task Force, was introduced to coconspirator Montelongo. Bain's purpose was to negotiate for the purchase of approximately 200 kilos of marijuana. After discussing the purchase, Montelongo said that he would have to contact his source and gave detective Bain his telephone number. Although detective Bain called Montelongo several times, the transaction could not be finalized and negotiations were postponed until after the first of the year.

On January 11, 1978, detective Bain, again contacted Montelongo, and they resumed the negotiations. Montelongo again agreed to check with his source and instructed Bain to call the next day. When Bain called, he was told to fly to El Paso for a meeting.

That next day, January 13, 1978, negotiations continued over the telephone, but the men disagreed over price and method of delivery of the marijuana. Montelongo wanted to sell the 220 kilos at $140.00 per kilo, while Bain was offering $130.00 per kilo; Montelongo wanted detective Bain to buy 70 kilos from one source first and then 150 kilos from another, rather than all 220 kilos at one time. The men agreed to meet at the Holiday Inn to resolve their differences.

Detective Bain arrived at the Inn at 4:33 p. m. with detective Carl Beasley, who, posing as the money man, had the $31,000.00 purchase price. Bain alone met Montelongo in Bain's car on the parking lot. An agreement was reached for Bain to buy only the 150 kilos available from the one source. Detective Bain also agreed to furnish a rented van for Montelongo to use in transporting the marijuana. Once the loaded van was delivered, the purchase price would be paid.

Montelongo left, stating that he would call his source and be ready to deliver the marijuana in half an hour and instructing Bain to call him later. After several phone calls between the two men, Montelongo called Bain at 7:30 p. m. and asked Bain to meet him at the Ranchlands Shopping Center. With detective Bain driving the rented van and detective Beasley driving another vehicle, the officers went to the shopping center where they waited for Montelongo. Coconspirators Montelongo and Orosco arrived in a white Chevrolet, and Montelongo introduced Orosco to Bain as his "main man," saying that they had the "stuff" and were ready to deliver.

At Orosco's request, detective Beasley showed him the $31,000.00 and satisfied, Orosco took the keys of the rented van. Giving the keys to Montelongo and direct-ing him to follow in the van, Orosco left the shopping center in the white Chevrolet. The officers remained at the shopping center to await their return.

Orosco, followed by Montelongo, drove to an apartment complex at 5133 Trowbridge in El Paso. There they met with two men and delivered the van to them. Then both vehicles left the apartment complex.

Montelongo and Orosco returned to Ranchlands Shopping Center in the Chevrolet, although they were supposed to have returned in the loaded van. Meeting the detectives, Montelongo informed them that Orosco's people were in the process of loading the van and were to call at the bar in the shopping center when ready to deliver. Detective Bain accompanied Montelongo and Orosco into the bar to wait; detective Beasley remained outside in the government automobile.

The rented van was driven to Fat Albert's Discotheque. Appellant Rodarte, driving a bronze Ford automobile with a white top, appeared there at 10:06 p. m. and the two men from the van approached the Ford and talked to the three men in it. After a brief conversation, the men returned to the van and both vehicles were driven to the parking lot for Tommy's Bar. There the rented van was parked next to the Ford which had arrived first, although these were the only vehicles in that area of the parking lot. The two people from the van got out and entered the Ford, and the Ford was driven out of the parking lot and was lost in traffic by surveillance units.

Shortly thereafter, the bronze Ford returned to the parking lot at Tommy's Bar. Two men got out of the Ford and into the van, and then followed the Ford, being driven by appellant Rodarte, to a residence at 7159 Dale Road; there, the van was driven into a fenced area behind the house. The Ford was parked at the curb, and appellant Rodarte remained in it after opening the door and speaking to someone across the street.

Behind the residence, two or three people appeared to be loading something into the

back of the van. They closed the van doors, and the van was driven out of the fenced area and back to the parking lot at Tommy's Bar, followed by the bronze Ford still being driven by Rodarte. Once there, the occupants left both the Ford and the van and entered the bar. At 10:59 p. m., several people walked out of the bar; three got into the Ford—appellant Rodarte, his brother and coconspirator Victor Manuel Montes, while the others got into the van. Surveillance officers followed the Ford, again being driven by appellant Rodarte, and the van as they returned to the apartment complex at 5133 Trowbridge where the men in the van met with someone who emerged from apartment # 8. Rodarte remained in the Ford parked across the street. After a short conversation, the van was backed into the alley and up to the rear of apartment # 8. Then the men began unloading packages of what was later determined to be marijuana from the van.

In the interim, at the bar in the Ranchlands Shopping Center, Orosco had left Montelongo to wait with detective Bain. At 10:55 p. m., four minutes before Rodarte left Tommy's Bar, Montelongo received a telephone call. Leaving with Bain and detective Beasley in Bain's car, Montelongo directed them to a service station on Trowbridge, one block away from the apartment complex where appellant Rodarte and the van were. Montelongo and the detectives were to wait at the station for the delivery of the loaded van, and if Bain was satisfied with the delivered contraband, he was then to pay the $31,000.00.

At the apartment, the signal for the arrest was given, and as the officers approached the men unloading the van, they ran into the apartment. They were pursued through the apartment; Orosco and Espinoza were apprehended in the bedroom where Orosco was trying to break a pane out of the window. Bautista was caught right outside the front door; but three suspects escaped. The officers seized 83 kilos of marijuana that were still in the van, one kilo brick located on an open shelf in the kitchen of the apartment, and forty-two kilos found in one bedroom.

Montelongo was arrested at the service station where he waited for the delivery of the van. Appellant Rodarte and his companions were arrested while still in the bronze Ford with the engine running. When Rodarte refused to get out of the car, the officers pulled him out, finding a loaded pistol on the floor board in front of where Rodarte had been sitting. A search of Rodarte revealed a package of marijuana wrapped in a piece of newspaper and tucked inside his belt.

Rodarte was advised of his rights several times and while being booked, approached one of the officers stating that he wanted to talk but not in front of the others, especially his brother. When separated from the others, Rodarte informed the officers that there was an additional quantity of marijuana located at the Dale Road residence, and he agreed to take them to the storage shed where the marijuana was kept. The officers again explained his rights to Rodarte to ensure that he understood them, and Rodarte still maintained that he would take them to see the marijuana. En route, Rodarte admitted to being the driver of the bronze Ford, but said he had remained in the car at the curb and had not gone to the shed in back where the marijuana was stored. When asked who the others involved were, Rodarte claimed not to know and said that they were friends of his brother.

At the Dale Street residence, Rodarte directed the detectives to enter through the gate and drive to the rear of the house where he pointed to the storage shed. The detectives and Rodarte walked to the shed, but it was padlocked, and Rodarte did not have the key. However, the detectives could look through the slats of the poorly constructed shed and saw a box inside containing a green leafy substance that they believed to be marijuana.

At that point, the owner of the house, Hector Hughes, walked out of the house and asked what was happening. Informing Hughes of the arrests and of the officers' belief that the shed contained marijuana,

the officers asked for the keys. Hughes stated that he had loaned the shed to the Rodartes, did not know what they were doing with it, and had no key to the shed. However, within a few minutes he was able to locate a key which opened the lock to the shed, and once inside, the officers seized the box containing ten pounds of loose marijuana and a set of scales.

## I. SUFFICIENCY

■ Appellant challenges the sufficiency of the evidence for his case to have been submitted to the jury and to support its verdict. Considering the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we conclude that the evidence was sufficient to sustain Rodarte's conviction on both counts of the indictment.

The evidence established that Rodarte drove the bronze Ford to Fat Albert's Discotheque where he was approached by the men from the van which was to be used to haul the marijuana. Rodarte then drove to Tommy's Bar where he picked up the men from the van and left. Rodarte, upon returning to Tommy's Bar, led the van to the Dale Road residence where the marijuana was stored. He parked the car at the curb and left only after the marijuana was loaded into the van. From that point on, Rodarte never left the loaded van. He accompanied the van back to Tommy's Bar and then, after a brief stop in the bar, left with the van and drove to the apartment complex at 5133 Trowbridge where he again waited across the street while the van was being partially unloaded. After his arrest, Rodarte admitted his participation and guided the detectives to the storage shed where the marijuana was kept.

This evidence is ample to establish Rodarte's nexus to the conspiracy and his knowing participation therein. *United States v. Teal*, 582 F.2d 343, 345 (5th Cir. 1978); *United States v. Trevino*, 556 F.2d 1265, 1268 (5th Cir. 1977).

Similarly, the evidence was sufficient to sustain a conviction on count two of the indictment. Title 18 U.S.C. § 2 provides that "whoever . . . aids, abets, counsels, commands, induces or procures" the commission of a federal crime is punishable as a principal for the violation itself.

> To aid or abet another in the commission of a crime within the meaning of the statute requires that the defendant "in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, (and) that he seek by his action to make it succeed."

*United States v. Trevino*, 556 F.2d 1265, 1269 (5th Cir. 1977), *quoting Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949). Much of the same evidence which establishes appellant's participation in the conspiracy also establishes that he aided and abetted the commission of the possession with intent to distribute marijuana. From the evidence produced at trial, a jury could conclude beyond a reasonable doubt that appellant was aware of the illicit purpose of his companions.

## II. POLICE REPORTS

Rodarte argues that he is entitled to a new trial because three government witnesses testified to information that was not contained in any of the reports furnished to him by the government. However, appellant concedes, as he must, that he was given complete access to the government's files, and that none of the three witnesses had personally prepared a written report or statement of the events in question.

■ While the government is under a duty to disclose the contents of its file where it has entered into an omnibus discovery agreement, *United States v. Phillips*, 585 F.2d 745 (5th Cir. 1978), or in the absence of such agreement to provide material as covered by Rule 16 of the Federal Rules of Criminal Procedure, or furnish Jencks Act material, 18 U.S.C. § 3500, it is under no duty to "seek out" evidence that would be helpful to the defense. *United States v. Walker*, 559 F.2d 365, 373 (5th Cir. 1977). Nor is the government under any duty "to

develop potential Jencks Act statements" as appellant seemingly contends. *United States v. Cruz*, 478 F.2d 408, 411 (5th Cir.), *cert. denied sub nom., Aleman et al. v. United States*, 414 U.S. 910, 94 S.Ct. 259, 38 L.Ed.2d 148 (1973). That appellant has shown no prejudice due to the questioned testimony, and that appellant made no objection to the witnesses' testimony on the grounds of unfair prejudice or surprise, only serves to buttress our conclusion of no reversible error.

### III. PRIOR CONVICTION

■ Appellant alleges that the trial court erred in allowing evidence of his prior Mexican conviction for a similar offense which was introduced in rebuttal. In particular, appellant urges that evidence of foreign convictions is inadmissible unless the trial court receives documents and instructs the jury on the criminal policies and procedures of foreign jurisdictions. However, foreign convictions stand on the same footing as domestic proceedings provided that the procedural protections necessary for fundamental fairness are observed by the foreign jurisdiction. *United States v. Wilson*, 556 F.2d 1177, 1178 (4th Cir.), *cert. denied*, 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 481 (1977). Absent specific allegations of procedural deficiencies, a trial court is under no duty to conduct, *sua sponte*, an inquiry into the presumptions and procedures of foreign jurisdictions.

■ Moreover, the evidence of Rodarte's Mexican conviction was admitted only after he took the stand and denied his intent to be involved in the offense for which he was being tried. As this Court recently noted in its *en banc* consideration of *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978), evidence of an extrinsic offense is admissible if the evidence is relevant to an issue other than defendant's character, and the probative value of the evidence outweighs its prejudicial impact. This evidence is both "relevant" and "probative", as defined in *Beechum*, and was therefore properly admitted.

### IV. CLOSING ARGUMENT

Appellant's final assertion of error concerns allegations of misconduct during the closing argument by the government attorney. Appellant isolates three specific portions of the government's arguments. First, the prosecutrix commented:

And in this regard, think of all of those overt acts too because these acts of course go to prove the second charge. But consider his statements made to the agents. Now, there is certainly no reason for the DEA agents to come in here and make up a big story.

At this point the appellant objected. The objection was sustained and the judge promptly instructed the jury to disregard the statement and to recall his previous instruction that the arguments of counsel were not to be considered as evidence.

■ While an attorney may not express personal beliefs concerning the merits of a case, it is proper to urge a conclusion based on the evidence. *United States v. Diharce-Estrada*, 526 F.2d 637, 641–42 (5th Cir. 1976). In addition, an attorney may not express a personal opinion as to the credibility of witnesses. *United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978). Applying the law to the case before us, the trial court was within its discretion in finding the statements of the prosecutrix improper. Nevertheless, it is not reversible error in that, upon examination of the entire record, substantial prejudice to the defendant does not appear. *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *United States v. Morris*, 568 F.2d 396, 402 (5th Cir. 1978). The curative instruction immediately after the prosecutor's statements sufficiently protected defendant's rights.

■ The second instance of alleged misconduct concerned this statement by the prosecutrix, "Mr. Hughes was the one who said yea, I loaned it to them." As the statement was a correct assertion of the evidence, it was, of course, properly argued.

■ The final words of the government were: ". . . for all these reasons, la-

dies and gentlemen, I think you can see that these are not the words or the acts of an innocent man. Thank you." The court recautioned the jury after sustaining appellant's immediate objection. We believe that the prosecutrix was not improperly asserting her personal belief, but rather, was arguing permissible conclusions to be drawn from the evidence. "The time has not yet come when a prosecuting attorney cannot argue the strength of his case—the weight and sufficiency of the evidence—and ask the jury for a conviction." *United States v. Wayman,* 510 F.2d 1020, 1028 (5th Cir.), *cert. denied,* 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 67 (1975).

In accordance with the foregoing, we affirm.

AFFIRMED.