**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Armando Adan JUAREZ,**
**Defendant-Appellant.**

**No. 77–5091.**

United States Court of Appeals, Fifth Circuit.

Jan. 17, 1978.

Rehearing Denied Feb. 27, 1978.

---

Joel D. Conant, San Antonio, Tex., for defendant-appellant.

Jamie C. Boyd, U. S. Atty., LeRoy Morgan Jahn, W. Ray Jahn, James E. Bock, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before TUTTLE, CLARK and RONEY, Circuit Judges.

TUTTLE, Circuit Judge:

The defendant, Armando Adan Juarez, was charged in a two-count indictment with conspiracy to possess heroin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 846, and with aiding and abetting the distribution of heroin, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Defendant was tried before a jury, convicted on both counts and sentenced to concurrent terms of 10 years imprisonment with a 15-year special parole term on each count. On appeal, defendant challenges the sufficiency of the evidence to support the jury's verdict and urges that certain remarks by the prosecutor during closing arguments amount to reversible error. We affirm.

## I. SUFFICIENCY OF THE EVIDENCE

At the close of the government's case, defendant moved for a judgment of acquittal under Fed.R.Crim.P. 29(a). The motion was denied and was not renewed at the conclusion of the defendant's evidence. Under those circumstances, it is well-settled in this Circuit that defendant waived any objection to the denial of his motion. *United States v. Binetti,* 547 F.2d 265, 268 (5th Cir.), *rev'd on rehearing on other grounds,* 552 F.2d 1141 (5th Cir. 1977); *United States v. Phipps,* 543 F.2d 576, 577 (5th Cir. 1976), *cert. denied,* 429 U.S. 1110, 97 S.Ct. 1146, 51 L.Ed.2d 564 (1977); *United States v. Edwards,* 488 F.2d 1154, 1158–59 (5th Cir. 1974). Our review therefore involves a determination of whether to affirm the con-

viction would entail a "manifest miscarriage of justice." *United States v. Perez,* 526 F.2d 859, 863–64 (5th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976) (footnotes omitted); *United States v. Jones,* 486 F.2d 1081, 1082 (5th Cir. 1973); *United States v. Andrews,* 431 F.2d 952, 952 (5th Cir. 1970) (per curiam). We find no miscarriage of justice here, since the less stringent standard which applies when a timely motion for acquittal is made is fully satisfied.

In evaluating a claim of insufficient evidence in accordance with the lesser standard, we must consider the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), resolving all reasonable inferences and credibility choices in support of the jury's verdict. *United States v. Zweig,* 562 F.2d 962, 963 (5th Cir. 1977); *United States v. Prout,* 526 F.2d 380, 384 (5th Cir.), *cert. denied,* 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976); *United States v. Black,* 497 F.2d 1039, 1041 (5th Cir. 1974). To reverse we must find that a reasonably minded jury necessarily must have entertained a reasonable doubt as to defendant's guilt. *United States v. Haggins,* 545 F.2d 1009, 1013 (5th Cir. 1977).[1]

At the time of the events leading to his conviction, defendant operated an auto repair service in a small garage located behind the "A & A Auto Parts" business at 3411 West Commerce Street, San Antonio, Texas. The parts store was operated by one Arturo Ortiz, who at the time was suspected of having dealt in heroin. A semi-public, coin-operated telephone, number 432–9673, was located in the parts store and billed in defendant's name. On February 6, 1976, Officer Russell Reina of the San Antonio Police Department[2] called telephone number 432–9673 and asked to speak to "Mando."[3] After learning that "Mando" was not available, Reina agreed to speak with one Martin Reyes, who previously had sold heroin to Reina.[4] During this conversation, Reina and Reyes came to terms on another sale of heroin, and Reina consented to call back in three days to be sure Reyes had obtained the merchandise.

At 9:30 a. m. on February 9, 1976, Reina again called 432–9673 and asked to speak to "Mando." On this occasion, defendant answered the phone, and the following conversation ensued:[5]

C. Mando?

A. Yeah.

C. This is Robert.

A. Robert, Robert?

C. Yes, what's up?

A. What Robert?

C. *Well, that guy's friend, man.*

A. *Oh yeah, yeah, yeah.*

---

1. The standard has also been expressed in terms of whether reasonable minds could have found the evidence inconsistent with the "hypothesis of the defendant's innocence." *E. g., United States v. Martinez,* 555 F.2d 1269, 1271 (5th Cir. 1977).

2. At the time of the investigation in this case, Officer Reina was assigned to the Drug Enforcement Agency as an undercover narcotics agent.

3. During both the investigation and the early stages of the proceedings against defendant, there was some confusion as to whether there might have been two persons named "Mando" working at 3411 West Commerce Street. A confidential informant had told Officer Reina that he possibly could arrange to purchase narcotics from a person named "Mando," who could be reached at 432–9673. A physical description of the person was provided by the informant. At first, Reina admittedly thought that Arturo Ortiz had a brother named "Man-do." However, Reina later learned, and testified at trial that such a person did not in fact exist. Reina also testified without dispute that "Mando" is a nickname for Armando and that defendant was the only "Mando" at the 3411 West Commerce Street location.

4. Reina testified that Reyes had used the name "Mando" during previous negotiations for the sale of heroin.

5. The conversations between Reina and the defendant were taped, and the tapes were made the subject of a pre-trial motion to suppress. The motion was denied, and the district court's ruling is not challenged on appeal. At trial, Officer Reina and Officer Rudolph Gonzales, both of whom had an opportunity to hear defendant testify during a preliminary hearing, identified defendant's voice as the voice on the tapes. Their testimony was uncontradicted.

C. What's up man?

A. Oh, nothing's happened.

C. Where were you all yesterday?

A. We weren't here yesterday.

C. Well, I was calling and calling over there.

A. Uh huh.

C. Martin didn't tell you?

A. No.

C. Oh.

A. What was he supposed to tell me?

C. That I was here, and I was to call you Sunday so that we could do something and all that.

A. No. he didn't tell me anything.

C. *Uh huh. Well today I'm going back, can I do anything?*

A. *Sure.*

C. Well—uh, I'm with my—with my girl, and I'm plain lost, understand me?

A. Uh huh.

C. Uh, just a minute. (to someone in the background) Gloria. (she answers) Yeah. Where are we going today? (her answer inaudible) What's the name, Wonderland? Do you know where Wonderland is?

A. Yeah.

C. Uh—I'm, uh, going to take my girl over there about—about 11:00.

A. Uh huh.

C. *Uh, can I call you from there, when I get there, and can you bring me something?*

A. *Uh huh.*

C. *Okay, uh—and the tires, how much is it going to cost?*

A. *Well, uh, I have to talk to that other guy, you know?*

C. *Uh huh.*

A. *Uh, about the tire, and then—by the time you call, everything will be ready.*

C. *Okay, I'll talk to you at—at about—about 11:00 or 11:30.*

A. *Okay.*

C. *Around there. Is that all right?*

A. *That's okay.*

C. Okay.

A. I'll see you.

C. Bye, bye.* [emphasis added].

Approximately 90 minutes later, surveillance officers observed a green Chevrolet station wagon, Texas license number EBZ-987, leave the 3411 West Commerce location. The vehicle proceeded to another auto parts store and eventually returned to 3411 West Commerce. The investigating officers subsequently learned that although the vehicle was registered to Arturo Ortiz, the address on the registration statement was that of the defendant.[6]

According to schedule, Reina called back to 11:20 a. m. Reyes answered the phone and told Reina that he was going to handle the deal "for Mando." It was agreed that Reyes would meet Reina at 12:15 p. m. at the "Wonderland Shopping Center." Some 30 minutes later, Reyes left 1211 West Commerce in the green station wagon, drove to a nearby dwelling and picked up an unidentified young man. The two men proceeded to a "Handy Andy" store in the shopping center, and a sale of heroin was consummated.

From February 9, 1976, until September 20, 1976, no contact was made with any of the parties involved in the sale. On the latter date, however, Officer Reina called 432–9673 and had the following conversation with the defendant:

A. Hello

C. Mando?

A. Yeah.

C. This is Robert speaking.

A. Robert, Robert, what Robert?

C. Do you remember me, Robert from Dallas?

---

**6.** Despite the government's argument to the contrary, we assign little probative value to the appearance of defendant's address on the registration statement. A government witness testified that there was no procedure to verify an address given at the time of registration. Ortiz was not indicted for the sale in question. And although the vehicle was used by Reyes to deliver the heroin to Reina, there was absolutely no evidence that defendant actually owned the vehicle or maintained exclusive control of its use.

A. No, I don't remember very well.

C. *Uh—well, we made a deal on some tires about—it's been about five or six months.*

A. *Oh, uh huh.*

C. *I am a friend of that other guy.*

A. *Yes, uh huh.*

C. Do you remember well now?

A. More or less.

C. —uh—

A. *I know who you are.*

C. I'm here in San Antonio, uh—uh—*I have this deal and I wanted to talk with you to see if you can do something with me.*

A. *No, well you know, it's just that that stuff, no more.*

C. *There isn't any more?*

A. *No.*

C. Well, just a chance there might be some, if not, well, that's all right.

A. Yeah.

C. How have you been?

A. Oh, swell.

C. Swell?

A. Uh huh.

C. Everything's all right?

A. Uh huh, lot of work.

C. That's good. Well, uh—well, then— then what's the use, right?

A. Yeah.

C. That's good—everything's cool as hell?

A. Yes, uh huh.

C. That's good.

A. Everything's swell.

C. *Well—there isn't—uh—no chance to get something in a few days or a month, something like that?*

A. *I wouldn't know. I don't know anything just now.*

C. You haven't seen Martin?

A. No, listen, I haven't seen him in a long time. It's been about six months, five months—no about four months.

C. Well, what happened to him?

A. He just left.

\* \* \* \* \* \*

C. Well, thank you.

A. Okay.

C. Bye. [emphasis added].

At some point soon after this conversation, the investigation apparently terminated.

▉ As previously mentioned, Count Two of the indictment charged defendant with aiding and abetting the distribution of heroin. This court must recently reviewed the nature of that offense and the pertinent evidentiary requisites in *United States v. Martinez*, 555 F.2d 1269 (5th Cir. 1977). In *Martinez*, we explained that

> it is not necessary that one sell contraband in order to aid and abet its distribution. . . . To aid and abet means to assist the perpetrator of the crime while sharing in the requisite criminal intent. . . . The crime consists of illegal assistance in the criminal act and a person may be convicted on the basis of his overall participation in the criminal venture. In order to sustain a conviction for aiding and abetting, the evidence must show that defendant was associated with the criminal venture, participated in it as in something he wished to bring about, and sought by his action to make it succeed. . . . Defendant must have shared the criminal intent or purpose and assisted in the accomplishment of that purpose.

*Id.* at 1271–72 (citations omitted).[7] Applying these standards to the instant case, we conclude that the evidence is sufficient to sustain a verdict of guilt for aiding and abetting the distribution of heroin.

The evidence at trial was undisputed that Martin Reyes sold a quantity of heroin to Officer Reina on February 9, 1976.[8] The

---

**7.** The opinion in *Martinez* reiterates several well-established rules of law in this circuit. *See, e. g., United States v. Jackson*, 526 F.2d 1236, 1238 (5th Cir. 1976); *United States v. Anthony*, 474 F.2d 770, 773 (5th Cir. 1973); *Clark v. United States*, 293 F.2d 445, 447 (5th Cir. 1961).

**8.** We previously have held that an accused need not have been present at the actual sale to be convicted of aiding and abetting. *United*

negotiations leading to that sale were conducted over a telephone registered in defendant's name. The defendant's role in this illicit transaction is made most clear by the substance of his conversation with Reina a few hours before the sale. To the casual listener, that conversation might seem perfectly innocuous, since neither a sale of drugs nor heroin was mentioned specifically. Instead, the parties talked in terms of "tires" and "do[ing] anything." At trial, however, Officer Reina testified, and the jury was entitled to believe, that "tires" was used as a private code name for "ounces of heroin,"[9] and that "doing something" commonly envisions a sale of narcotics. After the conversation had focused upon a possible sale of "tires," defendant stated that while he would have to speak with "that other guy" about the cost, "everything [would] be ready" when Reina called back. The evidence further showed that everything was indeed ready when Reina called. Martin Reyes informed Reina that he was handling the transaction for the defendant, agreed to meet Reina at the very location Reina and defendant had discussed, and completed the sale a short time thereafter.

On the basis of this evidence, a reasonable jury could have concluded that defendant and Reyes were more than casual acquaintants and that Reyes was a frequent visitor to the site of defendant's business. It also could have concluded that defendant discussed a sale of heroin with Reina and assumed the responsibility of orchestrating the necessary arrangements. Finally, it could have determined that the defendant informed Reyes of Reina's continuing desire

to purchase heroin, that a sale was imminent and that a location for the exchange had been agreed upon.[10] Under these circumstances, we must sustain the conviction for aiding and abetting.

■ Defendant was also convicted for conspiracy to possess heroin with intent to distribute and on that count received a sentence to run concurrently with the sentence imposed for aiding and abetting. Under the now familiar concurrent sentence doctrine, we need not consider the sufficiency of the evidence as to the conspiracy count, since we have concluded that the evidence supports the conviction for aiding and abetting. See *United States v. Alvarez*, 548 F.2d 542, 544 n. 4 (5th Cir. 1977); *United States v. Buchanan*, 544 F.2d 1322, 1325 (5th Cir.) *cert. denied*, 432 U.S. 907, 97 S.Ct. 2953, 53 L.Ed.2d 1080 (1977); *United States v. Varner*, 437 F.2d 1195, 1197 (5th Cir.) (per curiam), *cert. denied*, 404 U.S. 825, 92 S.Ct. 52, 30 L.Ed.2d 52 (1971); *Mishan v. United States*, 345 F.2d 790, 791 (5th Cir. 1965) (per curiam).

## II.  THE GOVERNMENT'S CLOSING ARGUMENT

■ As a second ground for reversal, defendant argues that certain remarks during the government's summation to the jury were threatening and intimidating. We must consider these remarks in the context of the entire record, *Sykes v. United States*, 373 F.2d 607, 612 (5th Cir. 1966), *cert. denied*, 386 U.S. 977, 87 S.Ct. 1172, 18 L.Ed.2d 138 (1967), and, since no objection was voiced at the time the statements were made, must affirm in the absence of "plain

*States v. Jackson*, 526 F.2d 1236, 1238 (5th Cir. 1976).

**9.** During the September 20, 1976, conversation, defendant told Reina that there was no more "stuff." Reina testified that "stuff" is a common code name for narcotics.

**10.** Although the name "Martin" was mentioned only once during the conversations between defendant and Reina, the jury could have reasonably concluded that Martin Reyes was "that other guy." On February 9, after defendant had told Reina that he would check with "that other guy" on the price for the narcotics, Reyes

surfaced a short time later and announced that he was handling the deal. Also during the September 20 conversation, defendant remembered Reina in connection with a "deal" made five or six months earlier and as a "friend of that other guy." Other than the unidentified young man present at the sale, Reyes was the only other person involved.

Any doubt as to defendant's association with and participation in the distribution evaporates when considered in light of the September 20 discussion about the "deal on some tires" and the availability of any additional "stuff."

error." *Dupoint v. United States*, 388 F.2d 39, 45 (5th Cir. 1967).

■ At the very beginning of his argument, the prosecutor told the jury that

[i]f you don't think that Armando Juarez is the "Mando" in this case, turn him loose. That is your responsibility. That is your prerogative, but based on the evidence in this particular case, . . . *I submit to you that you are violating your sacred oath before God if you do it*, but listen to that telephone conversation and then you decide whether or not they are talking about heroin and whether or not it is this defendant. [emphasis added].

The district court questioned the propriety of this remark sua sponte and, after consulting counsel, instructed the jury to "pay absolutely no attention" to it. Such a remark was improper. It was inexcusable. But counsel did not move for a mistrial and acquiesced in the court's curative measure. We therefore conclude that in light of the curative instruction, no plain error affecting the substantial rights of the defendant is presented in this regard.

The second remark came at the close of the government's argument. At that point, the jury was told that

[t]he second thing you have got to determine, and the most important, is whether or not Mando is the nickname for Armando Juarez, and whether or not Mando, referred to throughout this trial, is Armando Juarez, based on this evidence. *Ladies and gentlemen, it will be your verdict. Make it one you can be proud of. It will be your verdict. I wish it was mine.* [emphasis added].

We unfortunately have had to consider the effect of the "I wish it was mine" technique on two previous occasions. In *United States v. Dawson*, 486 F.2d 1326 (5th Cir. 1973), we held:

The language of the prosecutor was surely an unnecessary rhetorical flourish and was probably an insinuation that the defendant was guilty. But, while we do

not encourage such language, this court has consistently held that a prosecutor may express his belief in the guilt of a defendant if such belief is based solely on the evidence introduced and if the jury is not led to believe that other evidence, unavailable to them, justifies that belief.

*Id.* at 1330 (citation omitted). And in *United States v. Corona*, 551 F.2d 1386 (5th Cir. 1977), we reversed a conviction on several grounds including the identical ground presented here, since the prosecutor there "based his insinuation of guilt not just upon the evidence introduced, but also on that improperly injected by himself." *Id.* at 1390.[11]

■ The prosecutor in this case did not infect his argument with extra-record evidence, precluding a reversal under the principles established in *Dawson* and *Corona*. We are concerned, however, that our expression of disapproval of his particular remark continues to have little apparent effect in the prosecutor's office in the San Antonio Division of the Western District of Texas. It may seem inconsistent for this court to hold certain prosecutorial conduct improper and yet refrain from reversing a conviction in a case in which such impropriety occurred for the third time. The defendant's right to a reversal of his conviction, however, does not depend upon the egregiousness of prosecutorial misconduct, but whether such misconduct deprived him of a fair trial. Sanctions other than the reversal of a conviction exist for disciplining counsel. In proper cases such sanctions should be imposed by the appropriate district court.

AFFIRMED.

11. It should be noted that this case was tried and the improper comment was made after *Dawson* but before the opinion in *Corona* was published.