**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert Lee FRICK, Ellis Jay Pailet, and**
**Frank Harris, Defendants-Appellants.**

No. 77–5697.

United States Court of Appeals,
Fifth Circuit.

Jan. 26, 1979.

Rehearing Denied Feb. 28, 1979.

22. The interrogatories were drafted by the government and submitted to the district judge.

Daniel J. Markey, Jr., New Orleans, La. (Court-appointed), for Frick.

Edward M. Baldwin, New Orleans, La., for Pailet.

Ellis Pailet, pro se.

Robert J. Zibilich, New Orleans, La., for Harris.

John P. Volz, U. S. Atty., Ernest C. Chen, Robert J. Boitmann, Asst. U. S. Attys., New Orleans, La., for plaintiff-appellee.

Before WISDOM, GODBOLD and TJOFLAT, Circuit Judges.

GODBOLD, Circuit Judge:

Defendants Frick, Harris and Pailet were convicted by a jury of conspiracy, 18 U.S.C.

§ 371, mail fraud, *id.* § 1341 and wire fraud, *id.* § 1343. All defendants claim there was insufficient evidence to sustain the jury's verdict. We reject this contention. Pailet and Frick also claim that testimony concerning Pailet's sexual relationship with Frick's secretary was highly prejudicial and should have been excluded. As to Pailet, we agree. As to Frick, we hold that the evidence was admissible. Finally, Pailet contends that the jury charge on the duties of an escrow agent were not sufficiently specific and precise. The contention is without merit. We affirm the convictions of Frick and Harris and reverse the conviction of Pailet.

### I. Sufficiency of the evidence

Defendants moved for a judgment of acquittal at the close of the government's case. The motion was denied, and the defendants failed to renew their motion after presentation of their evidence. The motion was therefore waived, and the convictions must be affirmed unless it would result in a manifest miscarriage of justice. *U. S. v. Juarez,* 566 F.2d 511, 512–13 (C.A.5, 1978); *U. S. v. Perez,* 526 F.2d 859, 863–64 (C.A.5), *cert. denied,* 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976). In such a case our standard of review is clear:

> In evaluating a claim of insufficient evidence in accordance with the lesser standard [when the motion is not renewed], we must consider the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), resolving all reasonable inferences and credibility choices in support of the jury's verdict. *United States v. Zweig,* 562 F.2d 962, 963 (5th Cir. 1977); *United States v. Prout,* 526 F.2d 380, 384 (5th Cir.), *cert. denied,* 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976); *United States v. Black,* 497 F.2d 1039, 1041 (5th Cir. 1974). To reverse we must find that a reasonably minded jury necessarily must have entertained a reasonable doubt as to defendant's guilt. *United States v. Haggins,* 545 F.2d 1009, 1013 (5th Cir. 1977).

*U. S. v. Juarez, supra* at 513 (footnote omitted).

Under this standard the following facts could have been found by the jury. Frick was a loan broker doing business as Lakeside Investment Advisors, Inc. (LIA). Harris, an acquaintance of Frick, assisted Frick in the two loan transactions that gave rise to the indictment. Pailet, an attorney, served as the escrow agent in the two transactions.

The wire fraud convictions are based on a loan transaction with William Lucky, owner of Calculator & Computer Center, Inc. Lucky's business was in distressed financial condition and needed a loan of $500,000. After Lucky made unsuccessful attempts to secure the loan from banking institutions, he was referred to Frick as a person who might be able to put a loan agreement together. On October 12, 1976, Lucky signed an agreement with LIA, appointing Frick as the person to obtain the loan. The agreement also obligated Lucky to pay LIA $5,000 for finding a person willing to make a $500,000 loan commitment. Lucky gave Frick a promissory note for the brokerage fee. At that meeting Frick told Lucky that Kentfield Trust, a California business entity with $30,000,000 in assets would give Lucky a $500,000 letter of credit.

At the next meeting, October 25, Frick told Lucky that the lender wanted $10,000 placed in an escrow account payable according to the instructions of the lender at the time the commitment letter was signed. Pailet was designated by Frick as the escrow agent. Lucky made out four checks to Pailet each in the amount of $2,500. Three of the checks were paid and the fourth was returned for insufficient funds. Lucky was told that the $10,000 was the fee the lender required for giving the loan commitment.

On November 3, Frick and Lucky met again. Together they wrote a draft of a loan commitment Lucky would be satisfied with. At this meeting Lucky learned for the first time that First Charter Acceptance Corporation (FCAC) was the company that was to provide the loan commitment. Frick

told Lucky that FCAC was a subsidiary of Kentfield Trust. The following day, November 4, Harris traveled to Dallas, Texas, the home of FCAC, where he met with Marion Braxton, a founder of FCAC.[1] The meeting took place in the answering service office of a large commercial building in Dallas. At the time Harris went to Dallas, FCAC had no employees and no office. Its calls were handled by the building answering service. Harris presented Braxton with the draft of the loan commitment and asked that the draft be typed on FCAC letterhead. One of the persons working at the answering service typed the loan commitment and Vernon Gatewood, an associate of Braxton, signed it. Braxton testified that both Harris and Frick told him that FCAC's only obligation would be to sign the loan commitment.

Between November 2 and 4 Braxton and Gatewood prepared three sets of instructions to Pailet for the disbursement of the money held in escrow. One was based on the premise that all of Lucky's checks would clear, the second that $7,500 would clear and the third that $5,000 would clear. Because $7,500 had cleared, Braxton gave Harris the second set of instructions and Harris carried these instructions to New Orleans on November 5. On the same day Harris gave the loan commitment and the disbursement instructions to Pailet.

On November 5, Lucky was also busy trying to gather information about FCAC. He called Kentfield Trust and was told that they knew nothing of FCAC. Lucky relayed this information to Frick, but he was reassured by Frick that everything was going fine. Lucky also called Pailet that day, asked him if he still had the money and Pailet said that he did. Lucky told him not to disburse any of it. On Monday, November 8, Pailet disbursed the escrow funds, $2,466 each to Frick, Harris and FCAC, and $102 to himself.

The loan commitment given by FCAC required Lucky to accept or reject it within ten days of November 4, the date it was signed. Lucky first saw a signed copy of the commitment on November 12. A copy, however, was of no value because a bank would accept only an original. The original was in Pailet's hands. In a letter dated November 11, Pailet sent the original to Lucky. Though the letter was dated the 11th, the postmark on the envelope was November 16. Lucky testified that he received the letter on either November 16, 17 or 18. The commitment letter was received by Lucky after the 10-day option period had already expired. All parties now agree that even if the option had not expired the loan commitment was worthless because FCAC had no assets to back up the commitment.

The wire fraud statute under which defendants were convicted, 18 U.S.C. § 1343, condemns all schemes to defraud in which interstate wires are used to further the scheme. *U. S. v. Jackson,* 451 F.2d 281, 281 (C.A.5, 1971), *cert. denied,* 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972); *see U. S. v. Bradford,* 571 F.2d 1351, 1354 (C.A.5), *cert. denied,* 437 U.S. 908, 98 S.Ct. 3100, 57 L.Ed.2d 1140 (1978). The defendants argue that they were entitled to an acquittal because there was no evidence showing that they knew that FCAC had no assets, and without this knowledge, they argue, there could be no intent to defraud. We find that there was enough evidence from which the jury could infer that the defendants knew they were delivering Lucky a worthless piece of paper.

When Harris went to Dallas FCAC had no office or employees. The jury could infer that Harris realized that FCAC was a company without resources and that a loan commitment signed by FCAC was of no value. Other evidence supports this inference. Frick lied to Lucky when he told him that FCAC was a subsidiary of Kentfield Trust. The jury could have considered the falsehood as evidence that Frick was aware that FCAC could not back up its loan commitment, and that he tried to give FCAC an air of legitimacy by claiming it was a subsidiary of Kentfield Trust. Moreover, Lucky called Frick on November 5 and told

---

1. It was Harris who introduced Frick to Braxton.

him that he had discovered through Kentfield that FCAC was not related to Kentfield Trust and had found through his own banker that FCAC had no resources. The late mailing of the loan commitment by Pailet, which guaranteed receipt of the letter only after the option had expired, supports the jury's conclusion that Frick, Harris and Pailet never intended to procure a loan for Lucky. The jury could conclude that Pailet back-dated his cover letter so it would appear that he sent the loan commitment in a timely fashion, additional support for a finding of an intentional scheme to defraud Lucky.

Other factors support a jury conclusion that the defendants knew they were not obtaining a bona fide loan commitment. The preparation of three sets of disbursement instructions is inconsistent with a bona fide business transaction pursuant to which Lucky would be obligated to pay a $10,000 fee and FCAC obligated to guarantee a bank loan of $500,000 to Lucky. With so much at stake, the jury could justifiably infer that the lack of concern with Lucky's ability to make a $10,000 good faith deposit is both inconsistent with a bona fide business deal and consistent with a fake transaction by which Lucky would be mulcted of as large a portion of $10,000 as possible. Also, the manner in which Harris and Frick dealt with FCAC is inconsistent with a genuine transaction. FCAC, the party with $500,000 exposure, never investigated Lucky's business. Nor did it participate in drawing up the commitment. Harris merely handed the draft to Braxton and told him to type it up. A reasonable jury could find that if FCAC were really taking a chance of losing $500,000 it would have taken more interest in the transaction.

Although there was evidence supporting the defendants' claim that they did not know that FCAC had no assets, the jury was not obligated to credit it. We conclude that the jury did not necessarily "have [to] [e]ntertain a reasonable doubt as to defendant'[s] guilt," *U. S. v. Juarez, supra* at 513.

■ Under the conspiracy count, 18 U.S.C. § 371, the government had to show that the defendants conspired for an illegal purpose—wire fraud. Direct proof of an agreement is not necessary; circumstantial evidence supporting the conclusion that there was an agreement is sufficient. *U. S. v. Bobo,* 586 F.2d 355 at 366 (C.A.5, 1978); *U. S. v. Netterville,* 553 F.2d 903, 908 (C.A.5, 1977), cert. denied, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978); *U. S. v. Warner,* 441 F.2d 821, 830 (C.A.5), cert. denied, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). The government must show that each member participated in the conspiracy with knowledge of its illegal purpose and not merely that a member associated with a bad person. *U. S. v. Netterville, supra* at 911. Unquestionably Frick and Harris worked closely together in defrauding Lucky. Harris put Frick in contact with FCAC, and Harris transported the necessary documentation to and from Dallas for Frick. Both were aware that FCAC had no resources to back its commitment. The evidence was sufficient to support a finding that Pailet was a participant—he was connected to the conspiring group and his actions forwarded the purposes of the conspiracy. *U. S. v. Teal,* 582 F.2d 343, 345 (C.A.5, 1978); *U. S. v. Alvarez,* 548 F.2d 542, 544 (C.A.5, 1977). The late mailing of the commitment letter precluded Lucky from exercising his option. The jury could conclude that the late mailing was the means used by the conspiracy to carry out its assurance to FCAC that its only obligation was to sign a commitment letter. There was also evidence that Pailet back-dated his letter and jimmied a postage meter so it would appear that he sent the loan commitment sufficiently in advance so that Lucky could exercise his option. Considering all of the evidence tending to establish Pailet's knowing participation in the conspiracy, it was sufficient under the *Juarez* test.

The mail fraud convictions arise out of a loan transaction with William Long. Long was seeking a $180,000 loan to purchase the Lafayette Entertainment Center in Lafayette, Louisiana. He first attempted to obtain the loan from savings and loan associations but failed. Long then went into

the secondary loan market where he was introduced to Frick by Charles Ridgdell. At a meeting attended by Long, Frick, Ridgdell and several others, Long paid a $1,500 brokerage fee, $750 going to Frick. The loan broker Frick found for this deal was Mobile World Trade (MWT), a one-man operation run by Armando Gomez in Mobile, Alabama. On December 1, 1976, Harris and Frick traveled to Mobile to meet with Gomez. The defendants handed Gomez a draft of a loan commitment and told him to have it typed on MWT letterhead. Because Gomez had no employees, Frick and Harris were required to take the draft for typing to a print shop that also provided typing services. The typed commitment was then given to Gomez for signature. Gomez then typed up disbursal instructions of the escrowed money to Pailet.

Early in December, Frick called Ridgdell and told him to tell Long that the lender required a good faith deposit of $10,800. Long could come up with only $7,200, which was accepted by Frick and Ridgdell at a meeting held December 17. At that same meeting Pailet drew up an escrow agreement for the $7,200. On December 22, Pailet sent a copy of MWT's loan commitment to Long and disbursed the escrow money, $1,800 to MWT, $2,700 to Frick, and $2,700 to Harris. Out of Harris' and Frick's share, Pailet received $250.

The day before the December 22 payments, Pailet called Long and told him that a loan commitment had been obtained. When Long asked Pailet who gave the commitment Pailet evaded the question and told him he would send a copy. It was not until Pailet mailed the commitment to Long that Long discovered that it was given by MWT, even though the defendants knew as early as December 1, more than two weeks before Long gave Pailet $7,200, that MWT was the backer. On December 22 Long tried to get a loan from a bank on the strength of the MWT commitment and was told that the commitment was worthless. Long testified that he then tried to get in touch with Pailet for two weeks, but Pailet avoided him. When he finally got in touch with Pailet, Pailet assured him that the

commitment letter was bankable even though Long told him that his bank would not accept it. This was the first time Long realized that his money had been paid out of the escrow account. Long testified that Pailet could not remember to whom he had given the money. Long never received the loan he sought.

The defendants argue that the evidence detailed above is insufficient to prove a violation of 18 U.S.C. § 1341, which "condemns any scheme to defraud in which the mails are employed." *U. S. v. Melvin,* 544 F.2d 767, 773 (C.A.5), *cert. denied,* 430 U.S. 910, 97 S.Ct. 1184, 51 L.Ed.2d 587 (1977); *accord, Pereira v. U. S.,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435, 444 (1954). There was sufficient evidence to allow the jury to conclude that defendants knew MWT's commitment was worthless and, therefore, they intended to defraud Long. The jury could have inferred that the meeting at Gomez's office on December 1 revealed that MWT was incapable of making a loan commitment that a bank would rely on. Gomez testified that he had a very small office and no employees. A jury could conclude that Frick and Harris must have known that a company which had its loan commitment typed at a printing shop, and the typing paid for by Frick and Harris, could not have sufficient assets to back a loan for $180,000. The evasive behavior of Pailet and Frick after Long received the commitment is circumstantial evidence that they knew that MWT's commitment was worthless. Nor was it necessary that the defendants knew for certain that MWT had no assets. Reckless indifference for the truth can be fraudulent under the mail fraud statute. *U. S. v. Amrep Corp.,* 560 F.2d 539, 543 (C.A.2, 1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978); *U. S. v. Love,* 535 F.2d 1152, 1158 (C.A.9), *cert. denied,* 429 U.S. 847, 97 S.Ct. 130, 50 L.Ed.2d 119 (1976). Both Frick and Pailet reassured Long that the loan commitment was bankable. A jury could find that these representations were made with reckless indifference for the truth and were fraudulent. There was ample evidence for

the jury to conclude that the three defendants carried out a scheme to defraud Long and used the mails[2] to further that scheme.

## II. Prejudicial evidence

The government called Frick's secretary as a witness. Over the objection of defense counsel she testified that Frick told her to make herself available to Pailet and that she had sexual intercourse with Pailet on one occasion. The government offered this testimony as relevant to Pailet's motive for joining the other defendants in the scheme to defraud Lucky and Long. Pailet and Frick contest the relevance of the evidence and urge that, even if relevant, it should have been excluded under Fed.R.Evid. 403 as highly prejudicial.

■ The Federal Rules of Evidence define relevance broadly to include any evidence tending "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401; see *U. S. v. Allison,* 474 F.2d 286, 289 (C.A.5, 1973), cert. denied, 419 U.S. 851, 95 S.Ct. 91, 42 L.Ed.2d 82 (1974). Even if relevant, however, the district judge may exclude such evidence under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403; see *U. S. v. Hearod,* 499 F.2d 1003, 1004 (C.A.5, 1974).[3] A trial judge's ruling under Rule 403 may be reversed only if there was a clear abuse of discretion. *U. S. v. McDaniel,* 574 F.2d 1224, 1227 (C.A.5, 1978); *U. S. v. Grimm,* 568 F.2d 1136, 1138 (C.A.5, 1978); *U. S. v. Brown,* 547 F.2d 1264, 1266 (C.A.5, 1977).

The government's contention that the evidence is relevant to Pailet's motive fails

because Pailet was unaware of Frick's instructions to the secretary to make herself available. Pailet testified that he was unaware of Frick's instructions, and no proof was offered to the contrary. As a result of Pailet's lack of knowledge there is no basis for inferring that Pailet was motivated to participate in Frick's fraudulent schemes in return for the secretary's sexual favors. The secretary's testimony could give rise to an inference that Frick treated Pailet as a member of the conspiracy. Arguably, a further inference could be drawn—because Frick treated Pailet as a co-conspirator, Pailet was in fact one. Such an inference is too attenuated. Pailet had intercourse with the secretary on only one occasion and then paid her $25.[4]

■ The admission of the secretary's testimony was not harmless error. In the government's closing argument, her testimony was relied upon heavily by the prosecution as proof that Pailet had ample motivation to join the conspiracy. The government's evidence linking Pailet to the conspiracy and his role in the schemes was far from overwhelming. We conclude that Pailet's conviction may have been substantially influenced by the secretary's testimony. *Kotteakos v. U. S.,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557, 1566–67 (1946); *U. S. v. Rodriguez,* 573 F.2d 330, 334 (C.A.5, 1978); *U. S. v. Morris,* 568 F.2d 396, 402 (C.A.5, 1978); cf. *U. S. v. Rubin,* 559 F.2d 975, 985 (C.A.5, 1977) (improper impeachment of defense witness harmless error because government's case against defendant so strong).

■ Frick's conviction, however, must be affirmed. As we have discussed, it can be inferred from the secretary's testimony

---

2. Pailet mailed MWT's loan commitment to Long.

3. The government's contention that the evidence is relevant to Pailet's motive would make the evidence admissible under Rule 404(b) as an act probative of motive. But all evidence, regardless of which Rule permits its use, is subject to the limitation that evidence whose probative value is substantially outweighed by its prejudicial effect must be excluded. *U. S. v. Spletzer,* 535 F.2d 950, 955–56 (C.A.5, 1976).

4. A course of conduct indicating that a conspirator considers another person as a co-conspirator would of course be a statement under Rule 801(a)(2), nonverbal conduct intended as an assertion. It would not be hearsay as to Frick, however, because it was "his own statement [made] in . . . his individual . . . capacity." Fed.R.Evid. 801(d)(2)(A).

that Frick treated Pailet as an essential member of the conspiracy. Her testimony was, therefore, probative of the existence of a scheme to defraud led by Frick. Frick contends that even if her testimony was relevant it should have been excluded because it was so prejudicial. While undoubtedly evidence of Frick's pandering is prejudicial, we cannot conclude that the district judge abused his discretion in allowing it to come in.

██ We recognized in *U. S. v. Spletzer,* 535 F.2d 950 (C.A.5, 1976), that "[a]n important consideration relating to probative value is the prosecutorial need for such evidence." *Id.* at 956 (citing *U. S. v. Adderly,* 529 F.2d 1178, 1180 (C.A.5, 1976) and *U. S. v. Arteaga-Limones,* 529 F.2d 1183, 1197–98 (C.A.5, 1976)). As our foregoing review of the evidence indicates, while the evidence was sufficient to sustain the jury's verdict, this was not an open and shut case. The government needed evidence tending to indicate knowledge on the part of the defendants that the loan commitments obtained from MWT and FCAC were elements of a fraudulent scheme. The secretary's testimony tended to prove that these were not normal, good faith business transactions. Both jury common sense and judicial knowledge accept that Frick's instructions to his secretary were not normal business activities. Of course, prosecutorial need for testimony does not by itself mean that the probative value of the evidence will outweigh its prejudicial effect. It is necessary to look at all the circumstances to determine whether the judge abused his discretion. Here the secretary's testimony was offered primarily as probative of Pailet's motive for joining the conspiracy. Indeed, in the government's closing argument that was precisely how the evidence was argued to the jury. Because Frick's pandering was not emphasized, the prejudicial aspect of the secretary's testimony was less as to him. The district court did not abuse its discretion in allowing the evidence in against Frick.

### III. Jury instructions

██ Pailet contended that he acted properly as an escrow agent and that the jury was not properly instructed on this point. We disagree. The judge instructed the jury that

> Once an escrow agreement has been consummated, and a valid deposit of the escrow has been made, neither party can revoke the agreement without the other's consent

> .    .    .    .    .

> The duties of the escrow agent are those set out in the escrow agreement. As a general rule, the escrow agent must act strictly in accordance with the provisions of the escrow agreement.

These instructions adequately put before the jury Pailet's theory of defense. They were as precise and specific as required by our case law. *U. S. v. Wolfson,* 573 F.2d 216, 220–21 (C.A.5, 1978) (quoting *U. S. v. Gilbreath,* 452 F.2d 992, 994 (C.A.5, 1971)); *Perez v. U. S.,* 297 F.2d 12, 16 (C.A.5, 1961).

The judgments of conviction of Frick and Harris are AFFIRMED. The judgment of conviction of Pailet is REVERSED.