UNITED STATES of America,
Plaintiff-Appellee,

v.

Timothy Richard HOUDE and Barry
Alan La Brecque,
Defendants-Appellants.

No. 78–5453.

United States Court of Appeals,
Fifth Circuit.

June 11, 1979.

Joseph (Sib) Abraham, Jr., Charles Louis Roberts, El Paso, Tex., for defendants-appellants.

Jamie C. Boyd, U. S. Atty., LeRoy Morgan Jahn, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before GODBOLD, Circuit Judge, SKELTON, Senior Judge *, and RUBIN, Circuit Judge.

* Senior Judge of the United States Court of Claims, sitting by designation.

SKELTON, Senior Judge.

In this case the appellants, Timothy Richard Houde and Barry Alan La Brecque, along with William Dudley Connell and Mario Centeno, were charged by indictment on May 4, 1978, in the Western District of Texas with conspiracy to possess cocaine with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846. Appellant La Brecque was also charged with the completed substantive offense, and Appellant Houde, with aiding and abetting La Brecque's possession of cocaine in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). After being convicted by a jury, Appellant La Brecque was sentenced to consecutive nine-year terms of imprisonment and nine-year special parole terms, and Appellant Houde received consecutive seven-year terms of imprisonment and seven-year special parole terms. They have both appealed their convictions.

The facts alleged in the briefs of the Appellants and the Government are substantially the same. We adopt the statement of facts in the Government's brief. This statement of facts shows that in March of 1978, William Dudley Connell, a travel agent in El Paso, Texas, and a co-conspirator in this case, was asked by Appellant La Brecque to find buyers for cocaine; La Brecque told Connell that he had connections with "the Mexicans" and could obtain large quantities of cocaine. A few days later, on March 20, 1978, Connell called Appellant Houde and told him he had found a purchaser. Appellant Houde responded that he had a pound of cocaine, and Connell went to Houde's house to get it.

After obtaining the narcotics from Houde, Connell sampled it by tasting and inhaling. The substance was cocaine. Connell packaged the cocaine in four plastic bags to be taken to Seattle for sale by his girlfriend, Jody Liggin. The price was $24,-000, and Connell was to pay this to Appellant Houde upon Liggin's return. Connell retained less than half of a gram of the cut cocaine and twenty grams of uncut cocaine from the pound he received from Houde.

The next day, Liggin flew to Denver where she was met by a friend of Connell's, and together they flew to Seattle. However, the expected purchase did not occur, and Liggin returned to Denver where she was met and escorted to El Paso by Connell. Upon reaching Connell's home in El Paso, Connell discovered that only three of the packages were in the same condition that they were in when he had packaged them. One package had been adulterated by some unknown substance, and some of the cocaine was missing from it.

Shortly after the couple returned to the house, Appellant Houde called trying to locate Connell. Although Liggin, at Connell's instructions, informed Houde that Connell was still in Denver, Appellants Houde and La Brecque appeared at Connell's house an hour later.

The three men had a serious conversation about the adulteration of the cocaine, because the cocaine had been delivered to them by the Mexicans without prepayment, and money was still owed on it. Each decided to raise as much money as he could to help pay the debt to the Mexicans. Although returning one package of the cocaine and the twenty grams of uncut cocaine to Appellants La Brecque and Houde, Connell gave two of the three packages of cocaine to another individual and retained the small quantity that he had skimmed off the original pound.

Sometime thereafter, Appellant La Brecque informed Connell that Appellant Houde had been kidnapped by the Mexicans and that he and his car would be retained in Juarez, Mexico—the border town across from the river from El Paso—until the $8,000 still owed the Mexicans was paid. Connell responded that he had received a call from a person he knew as Dave Anderson, seeking to purchase large quantities of cocaine, and this transaction would assist them to raise the money to get Houde released. However, the men managed to raise sufficient money to release Appellant Houde, although the Mexicans retained his car.

Connell was still anxious to deal with Dave Anderson of Denver and asked Appellant La Brecque to see if the Mexicans would provide them with a quantity of cocaine without prepayment to enable them to repay the balance due on the original cocaine transaction. Although Appellant La Brecque doubted that the Mexicans would agree, he said he would approach them. Reporting back, Appellant La Brecque stated the Mexicans would provide one pound of cocaine under very strict guidelines and would not allow the cocaine to leave their sight or possession until delivery.

About April 15, 1978, Connell flew to Denver and met with Dave Anderson, who in reality was Gary Lee Graham, a narcotics detective working under cover with the Denver Police Department. Detective Graham and Connell discussed the details of the transaction with Graham negotiating to purchase three to four pounds of cocaine to be delivered in El Paso the following Tuesday. Connell informed Detective Graham that he had a Mexican connection that would deliver to "Barry" who in turn would supply the cocaine to him.

Returning to El Paso, Connell met with Appellant La Brecque to discuss the possibility of arranging the transaction by the following Wednesday. Appellant La Brecque informed Connell that he could get the cocaine and instructed him to arrange for Detective Graham to come to El Paso. After several telephone calls, Detective Graham arrived in El Paso on April 19, 1978. While there, Detective Graham refused to buy ¼ ounce of cocaine for $500, and negotiations for the delivery of the several pounds were unsuccessful; so, Graham returned to Denver.

Again, after numerous telephone calls, Detective Graham, accompanied by Detective John O'Dell, returned to El Paso five days later to finally buy the three to four pounds of cocaine. Detective Graham received assurances from Connell that he had a pound of cocaine in his possession before Graham left Denver and he informed Connell that he would have to return to Denver

on the same day. Accordingly, Connell spoke to Appellant La Brecque, explaining that Detective Graham would arrive at 3:45 p. m. and had to leave at 7:20 p. m., so the cocaine sale had to occur within that time frame.

When Detective Graham and Detective O'Dell arrived at the airport, surveillance agents observed Appellant Houde in the concourse where Graham's flight deplaned and at the lobby doors of the airport. However, it was Connell who met the detectives, taking Detective Graham to a local restaurant in a rented recreational vehicle. Detective O'Dell was to follow the men in a separate rented vehicle and used the opportunity to meet with local agents of the Drug Enforcement Administration to obtain a flash roll of $24,000.

Graham and Connell arrived at the restaurant at approximately 6:35 p. m., and Connell, having seen Appellant La Brecque inside, told Detective Graham that he had to go inside to talk to "Barry". Inside, La Brecque informed Connell that the Mexicans would only deliver half a pound; later, if everything went smoothly, they would deliver the rest of the cocaine. The Appellant La Brecque was observed leaving the restaurant. He approached the driver's side of a brown Ford sedan and spoke to its occupants. The brown Ford left the parking lot, and Appellant La Brecque returned to the restaurant.

Connell returned to the recreational vehicle and moved it to the other side of the parking lot to wait for the delivery of the cocaine. Seeing that Detective O'Dell had arrived and parked 100 to 150 feet behind them, Detective Graham left Connell on the pretext of assisting O'Dell to count the money. After bringing O'Dell up to date, Detective Graham returned to the recreational vehicle.

Shortly thereafter, at approximately 6:50 p. m., a blue Volvo station wagon arrived on the parking lot and was parked in front of the restaurant. In the blue station wagon was Appellant Houde, the driver. He was joined by Appellant La Brecque. Connell pointed to the blue station wagon and said

that the Mexicans would first go to Barry. Then Appellant La Brecque got out of the station wagon and approached the pay telephone just outside the restaurant's front door, where he dialed a number, waited a brief time, and hung up, returning to the Volvo. Within a minute, the same brown Ford sedan containing two Mexican-American males arrived on the parking lot. The Ford was parked parallel to the recreational vehicle, and two Mexican-American men got out of it and approached the Volvo. Connell said, "Here they are!"

As the men approached the Volvo, one of them lifted the front of his shirt and reached down inside his pants as though he were about to bring something out. However, Appellant La Brecque waved at the man with one hand and stopped what appeared to be about to happen. La Brecque then entered the restaurant and went directly to the restroom followed by one of the Mexican-American males. The other man remained in the restaurant looking around.

Concerned, Detective Graham instructed Connell to find out what was occurring; Connell left the recreational vehicle and approached the Volvo to ask Houde what was going on. Appellant La Brecque was in the restaurant and Connell returned, saying that "Barry" was making the pickup in the bathroom.

Having left the recreational vehicle to allegedly reassure Detective O'Dell, Detective Graham returned just as Appellant La Brecque was going through the door of the trailer. Connell said, "Come on, Barry, let's do it," and La Brecque, after apologizing for the delay, pulled out a plastic bag containing one-half pound of cocaine and placed it on the counter in front of Detective Graham.

Detective Graham field tested the substance and obtained positive results for cocaine. He then asked Connell to weigh it, and agreed to a price of $14,000. When Detective Graham questioned Connell regarding the quality of cocaine, Connell referred the question to "Barry," and Appellant La Brecque stated that the cocaine was 80% pure. Detective Graham left the recreational vehicle to allegedly obtain the purchase money, and gave the signal for the arrest of the four co-conspirators.

The Appellants and the attorney for the Government signed the following "Omnibus Agreement" on May 17, 1978:

' "3(a) The parties agree to exchange all statements [Per 18 U.S.C. § 3500(e)] and reports of statements (including written reports of investigator's interviews) of all witnesses they expect to call in its case in chief. If any, will provide five days prior to trial.

and

14(j) the parties acknowledge that any duty to disclose imposed herein is a continuing duty, and that any discoverable evidence or material becoming known during the pendency of this case will be promptly disclosed to the opposing party.

s/ CHARLES LOUIS ROBERTS
Attorney for Defendant

s/ JAMES W. KERR, JR.
Attorney for Government"

The case was scheduled to go to trial on June 5, 1978. The record shows that prior to May 31, 1978, Appellant had access to the agency reports of the Government, and the results of its laboratory tests of the cocaine, all in accordance with the Omnibus Agreement. On May 31, 1978, Appellants' counsel asked Government counsel for a list of Government witnesses. Government counsel replied on June 1, 1978, that he had no witnesses whose names were not in the case reports already given to Appellants' counsel, but investigation was continuing and names of any additional witnesses would be supplied as soon as possible. On June 2nd Government counsel sent Appellants' counsel a list of witnesses which included the names of co-conspirator Connell and Jody Liggin. A statement was taken from Connell on June 1st and Jody Liggin gave a statement on June 2nd. However, copies of both statements were not given to Appellants' counsel until the first day of the trial on June 5th.

Appellants filed a motion for sanctions and a motion for continuance on June 5th, claiming that Government counsel had

breached the Omnibus Agreement by failing to furnish the names of witnesses Connell and Liggin when they were known to Government counsel, and by failing to furnish copies of their statements to Appellants' counsel prior to the 1st day of the trial on June 5th. Both motions were denied by the court. The facts show that Appellants' counsel knew that Connell was going to testify as a Government witness before his name was furnished to them. Furthermore, they knew from the case report the connection Connell had with the case.

■ Appellants' motion for continuance was general in character. The only prejudice alleged was that "the Government received the surprise and other advantages of its lack of faith." However, the above facts show that Connell's testimony was no surprise to Appellants. They are not entitled to a reversal of their convictions in the absence of showing prejudice. See *United States v. Phillips*, 585 F.2d 745 (5 Cir. 1978). This is true even if Government counsel did not comply with the agreement. At oral argument, Appellants' counsel were unable to point out any prejudice to their clients, and they have not alleged any. The argument that the failure to comply with the omnibus agreement constitutes a denial of due process is based on a faulty premise. As we have already said, no prejudice has been shown. Even when there has been non-compliance with the statutory mandate of the Jencks Act, this is not per se a violation of the constitution. Prejudice must be shown. This applies a fortiori to violation of an agreement.

In any event, the statements of the witnesses were Jencks Act material which, in the absence of the omnibus agreement, Government counsel would not have been required to furnish until the witnesses had testified. See 18 U.S.C. § 3500(b). Appellants' counsel admitted this to be true at oral argument. The trial court could have granted a reasonable recess under 18 U.S.C. § 3500(c) upon request of counsel for Appellants to examine the Jencks Act material, but they made no such request after the material was delivered to them.

■ The question of a continuance is traditionally within the trial court's discretion, and subject to reversal only for an abuse of discretion. *United States v. Smith*, 548 F.2d 545, 548 (5 Cir. 1977), *cert. denied*, 431 U.S. 959, 97 S.Ct. 2685, 53 L.Ed.2d 277 (1977); *United States v. Uptain*, 531 F.2d 1281, 1285 (5 Cir. 1976); *United ed States v. Sahley*, 526 F.2d 913, 918 (5 Cir. 1976); *United States v. Moriarity*, 497 F.2d 486, 489 (5 Cir. 1974); and *United States v. Clements*, 484 F.2d 928, 930 (5 Cir. 1973). To establish that a denial of a continuance is arbitrary, the movant must show that the denial seriously prejudiced him. *United States v. Miller*, 513 F.2d 791, 793 (5 Cir. 1975). No such prejudice has been shown in this case. We hold that there was no abuse of discretion by the trial court in denying the motion for sanctions and the motion for a continuance.

Appellants complain that the evidence was insufficient to sustain their convictions. We disagree.

Appellant Houde was convicted of conspiracy to possess cocaine with the intent to distribute, and aiding and abetting La Brecque's possession of cocaine. Appellant La Brecque was convicted of the same conspiracy, and also of the completed substantive offense. He challenges only the sufficiency of the evidence on the conspiracy count. Because the question of the sufficiency of the evidence is the same on all three counts as to both Appellants, they will be considered together.

■ It is well settled that where a jury has rendered a verdict of guilty, the evidence sustaining that verdict must be examined in the light most favorable to the Government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Also, it has been held that all reasonable inferences and credibility choices must be made in favor of the jury verdict. *United States v. Prout*, 526 F.2d 380, 384 (5 Cir. 1976), *cert. denied*, 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976); *United States v. Black*, 497 F.2d 1039, 1041 (5 Cir. 1974); and

*Gordon v. United States,* 438 F.2d 858, 867 (5 Cir. 1971), *cert. denied,* 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971). We held in *United States v. Placios,* 556 F.2d 1359, 1364 (5 Cir. 1977):

"The standard for review of the sufficiency of evidence to support conviction is the same whether the evidence is direct or circumstantial. See *Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); *United States v. Warner,* 441 F.2d 821 (5 Cir. 1971), cert. denied 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58."

■ To prove the conspiracy, the Government had to establish the existence of an agreement by two or more persons to combine efforts for an illegal purpose, and, while this Court has frequently stated that an overt act by at least one of those persons in furtherance of that agreement is required, no overt act need be alleged or proved in prosecuting a drug conspiracy under 21 U.S.C. § 846 or § 963. *United States v. Thomas,* 567 F.2d 638, 641 (5 Cir. 1978); *United States v. Palacios, supra,* 556 F.2d at 1364, n. 9; *United States v. Beasley,* 519 F.2d 233, 247 (5 Cir. 1975), vacated and remanded on other grounds, 425 U.S. 956, 96 S.Ct. 1736, 48 L.Ed.2d 201 (1976). Proof of the illegal agreement or common purpose may rest upon either direct evidence or upon inferences drawn from relevant and competent circumstantial evidence. *United States v. Warner, supra.*

■ The Government's evidence in the instant case contains no proof of an expressed agreement to commit the offenses charged. However, direct proof of a formal agreement is not necessary to establish a conspiracy whose " 'existence often is proven by inferences from the actions of the actors or circumstantial evidence of a scheme'." *United States v. Riggins,* 563 F.2d 1264, 1267 (5 Cir. 1977), quoting, *United States v. Amato,* 495 F.2d 545, 549 (5 Cir. 1974), *cert. denied,* 419 U.S. 1013, 95 S.Ct. 333, 42 L.Ed.2d 286 (1974). As this Court stated in *United States v. Jacobs,* 451 F.2d 530, 535 (5 Cir. 1971), *cert. denied,* 405 U.S. 995, 92 S.Ct. 1170, 31 L.Ed.2d 231 (1972):

"Persons who enter into a conspiracy to commit a criminal offense do not do so openly, and generally a conspiracy can be established only by evidence of the attendant circumstances and the concerted acts and conduct of the alleged conspirators and the inferences reasonably deducted therefrom that logically and consistently warrant the conclusion that an unlawful agreement, expressed or implied, existed."

See also, *Park v. Huff,* 506 F.2d 849, 860 (5 Cir. 1975), *cert. denied,* 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); *United States v. Ryan,* 478 F.2d 1008 (5 Cir. 1973); *United States v. Harvey,* 464 F.2d 1286 (5 Cir. 1972), *cert. denied,* 410 U.S. 938, 93 S.Ct. 1399, 35 L.Ed.2d 604 (1973); *United States v. Sutherland,* 463 F.2d 641 (5 Cir. 1972), *cert. denied,* 409 U.S. 1078, 93 S.Ct. 698, 34 L.Ed.2d 668 (1972).

Applying these principles to this case, we agree with Government's counsel that the following facts, which we repeat, prove that the evidence was sufficient to sustain the convictions of Appellants.

■ The evidence showed that while Appellant La Brecque asked co-conspirator Connell to find buyers for cocaine, it was Appellant Houde who supplied the cocaine once the purchaser was found. The joint involvement of Appellants is further established by their appearance together at Connell's house after he returned from Denver and was supposed to have the $24,000 that was due Appellants for the cocaine. While both Appellants appeared at Connell's house, it was Appellant Houde who made the telephone call attempting to locate Connell and the $24,000. When Appellants Houde and La Brecque learned that the money was not forthcoming and some of the cocaine was adulterated, they jointed decided to raise what money they could to pay the debt to their Mexican supplier. It was Houde who was kidnapped and La Brecque and Connell bailed him out through partial payment to the Mexicans.

With respect to the dealings with Dave Anderson, it is undisputed that Appellant

Houde and Appellant La Brecque were jointed present at the delivery site, that they were there together in Appellant Houde's car, and that when questioned by Connell, Houde informed him that La Brecque was taking delivery of the cocaine in the restroom of the restaurant. Shortly thereafter, Appellant La Brecque left the restaurant and delivered one-half pound of cocaine to Detective Graham.

The joint meetings of Houde and La Brecque that were essential to the continuing conspiracy, their manner their conversations with Connell and the agents, and the actual delivery of cocaine proved that Appellants were working actively and in concert to possess cocaine with the intent to distribute it to Detective Graham. Further, each was present, either singularly or collectively, at various crucial stages of the negotiations when cocaine and various narcotic transactions were discussed. We hold that the evidence supports the decision of the jury that Houde and La Brecque were guilty beyond a reasonable doubt of the conspiracy as charged.

■■■■■ The Appellant La Brecque was convicted of the substantive offense of possessing cocaine with the intent to distribute it. He does not challenge the sufficiency of the evidence on this count, although he did contest the sufficiency of the evidence on the conspiracy charge, as shown above. Appellant Houde was convicted of aiding and abetting La Brecque's possession of cocaine with intent to distribute it. He challenges the sufficiency of the evidence on this charge.

The evidence showed that Appellant Houde was an active participant, aiding and abetting Appellant La Brecque in possessing the cocaine with intent to distribute it to Detective Graham. It will be recalled that the debt owed to the Mexicans who were Appellant's source of supply was jointly that of Connell, Houde, and La Brecque, and that Houde had much to gain by insuring the possession of the cocaine by La Brecque and its distribution to Detective Graham so that money could be obtained to liquidate the debt to the Mexicans.

Before one can be convicted under the law of principals, it is necessary to prove that he aided or abetted the commission of a federal crime by another. In making such proof, it is only necessary for the prosecution to show that the defendant in some way " 'associate[d] himself with the venture, that he participate[d] in it as in something he wishe[d] to bring about, and that he [sought] by his action to make it succeed.' L. Hand, J., in *United States v. Peoni* [, 2nd Cir.] (CCA 2d NY) 100 F.2d 401, 402." *Nye and Niessen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949); and, *United States v. Trevino*, 556 F.2d 1265 (5 Cir. 1977). Houde's participation in the substantive offense was clearly proven in the instant case. The proof of this fact was more than sufficient to meet the required test. See *United States v. Baldarrama*, 566 F.2d 560 (5 Cir. 1978).

■■■ The Appellants complain of five instances where they objected to the closing argument of the prosecutor as being prejudicial, and which they contend denied them a fair trial. The trial judge overruled some of the objections and sustained others. However, in each instance, the judge gave appropriate instructions to the jury regarding the argument. We have examined the argument of the prosecutor and the instructions of the court and have concluded that if there was any error, which is doubtful, such error was adequately cured by the instructions of the court. See *United States v. Morris*, 568 F.2d 396, 402 (5 Cir. 1978); and *United States v. Arteaga-Limones*, 529 F.2d 1183, 1191 (5 Cir. 1976), *cert. denied*, 429 U.S. 920, 97 S.Ct. 315, 50 L.Ed.2d 286 (1976).

■■■■ It is well settled that the test to be applied is whether the prosecutor's argument, taken as a whole and in the context of the entire case, prejudicially affected the substantial rights of Appellants. *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); and *United States v. Rodriquez*, 503 F.2d 1370 (5 Cir. 1974). We hold that, considering the curative charges

of the court to the jury, the substantial rights of the Appellants were not prejudicially affected by the argument of the prosecutor. He was entitled to make a fair response to the argument of defense counsel and to comment on the evidence. In our opinion his remarks in this case were in line with the principle of fair reply. *United States v. Hiett*, 581 F.2d 1199, 1204 (5 Cir. 1978). Furthermore, at the conclusion of the arguments, the trial judge invited Appellants' counsel to submit any further curative instructions regarding the argument to which they had objected, but counsel did not submit any such requested instructions.

Finally, Appellants complain that the trial court should not have imposed special parol terms after they were convicted of narcotics violations. However, Appellants concede that this court previously held that a special parole term was properly applied to a 21 U.S.C. § 846 sentence in *United States v. Dankert*, 507 F.2d 190 (5 Cir. 1975).[1] They ask that we re-examine and re-evaluate our prior holding in this regard. We are without authority to overrule a decision of a prior panel of this court on the same question. See *United States v. Hernandez*, 580 F.2d 188, 191 (5 Cir. 1978), affirmed and remanded for resentencing, 591 F.2d 1019 (5 Cir. *en banc*, 1979). Furthermore, we conclude that a special parole term after conviction of a narcotics offense is proper under the statute.

Accordingly, the convictions of Appellants are affirmed.

AFFIRMED.

---

**1.** This decision has now been followed by the Second Circuit in *United States v. Wiley*, 519 F.2d 1348, 1351 (2 Cir. 1975), *cert. denied, sub nom. James v. United States*, 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976); the Eighth Circuit in *United States v. Rich*, 518 F.2d 980, 986–987 (8 Cir. 1975), *cert. denied*, 427 U.S. 907, 96 S.Ct. 3193, 49 L.Ed.2d 1200 (1976); and the Tenth Circuit in *United States v. Jacobson*, 578 F.2d 863 (10 Cir. 1978).