UNITED STATES of America,
Plaintiff-Appellee,

v.

David THOMAS, Defendant-Appellant.

No. 80–9039.

United States Court of Appeals,
Eleventh Circuit.

May 17, 1982.

John W. Stokes, Jr., Decatur, Ga., for defendant-appellant.

Julie E. Carnes, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before MORGAN, HILL and KRAVITCH, Circuit Judges.

JAMES C. HILL, Circuit Judge.

The appellant, David Thomas, was tried by a jury and found guilty on two counts, one charging him with conspiracy and another charging that he and two co-conspirators—aided, abetted, and counseled by one another—possessed with the intent to distribute a quantity of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 18 U.S.C. § 2.[1] In this appeal, Thomas asserts several errors by the trial court; we affirm his conviction.

## I. The Facts

On January 17, 1980, Detective Thomas D'Azevedo of the Dade County Department of Public Safety was stationed at the Miami International Airport. While on duty, his attention was drawn to the appellant and two women near the Delta Airlines ticket counter. The appellant was standing several feet from the counter, facing away from it; the two women, later identified as Barbara Gooden and Elizabeth Hollins, were in the ticket line. Gooden walked to Thomas and obtained money from him in a manner that the officer thought was "partially concealed." Gooden then walked back to the head of the ticket line and handed the money to Hollins, who used it toward the purchase of tickets.

At the counter, Hollins told the ticket clerk that she had a reservation in the name of Miss "P. Hall," but Gooden corrected her, telling the agent that the reservation was for "Hill." When Hollins had trouble spelling the name for the ticket agent, Gooden spelled it for her. Hollins also purchased two tickets in the name of "Strother."

After the two females had completed their transactions and had departed the main lobby, Detective D'Azevedo consulted a Delta Airlines reservation computer. The information on file for passenger "P. Hill" showed that the reservation had been made approximately one hour before the flight's scheduled departure and that the party making the reservations had given Miami telephone number 871–9300 as a call back number. Subsequent investigation by the

officer revealed that this was the number of a barber shop located within the airport. The "Strother" reservation gave no call back number.

As Thomas walked away from the ticket counter and toward the departure gates, he was stopped by D'Azevedo and another officer and was asked for his name and some identification. Thomas complied. When asked how long he had been in Miami, the appellant said a week and two days. Thomas first represented that he was traveling alone; when asked for his ticket, however, he answered that he did not have one and that his girlfriend, with whom he was traveling, had his ticket. After a few minutes, the two females observed earlier by Detective D'Azevedo approached. The appellant indicated that Gooden was his girlfriend. Upon request, the women produced personal identification for the officers. When asked how long they had been in Miami, the women contradicted one another. Hollins said that she, Gooden, and the appellant had been at the Crossways Motor Inn for five days; Gooden said that she and the appellant had been at the Crossways for four days.

The officers did not pursue their questioning. Instead, they wished the three a nice trip and watched as they boarded Delta flight 1122 for Atlanta. After the flight had departed, Detective D'Azevedo called the Crossways Motor Inn to confirm the information received from the appellant and the women. D'Azevedo learned, however, that no one using any of the names given—Thomas, Hill, Strother, Gooden, or Hollins—had been guests at the motel during the time period which had been indicated to the officers.

While the trio was en route to Atlanta, the Miami officers phoned Atlanta. Detective James E. Burkhalter of the Atlanta Police Department was advised of the apparent irregularities in the names and the other information received by Detective D'Azevedo. When Delta flight 1122 arrived

---

1. The two alleged co-conspirators had been indicted and tried earlier. One was convicted by a jury and the other on a plea of nolo contendere.

in Atlanta, Detective Burkhalter and DEA Agents Terry Mathewson and Paul Markonni were waiting. The two females, Hollins and Gooden, deplaned among the first few passengers and were immediately identified by the Atlanta agents from physical descriptions provided by Detective D'Azevedo. The appellant, deplaning among the last few passengers, did not appear until several minutes had passed.

Detective Burkhalter and Agent Mathewson followed Gooden and Hollins to the baggage claim area. The women claimed five separate pieces of luggage and began to leave the terminal. As they approached a taxi stand located just outside the airport, they were approached by Burkhalter and Mathewson, who identified themselves as police officers and asked to speak with the women. The women represented that their names were "P. Hill" and "B. Strother" and presented airline tickets issued in those names. When asked for identification, though, they presented a driver's license issued to Francis Elizabeth Hollins and a credit card issued to Mary Strother. The women said that they were singers, had been on vacation in Miami, were traveling as a party of two, and knew no one else on the plane. When agent Mathewson stated that he had spoken with Detective D'Azevedo about the events in Miami, Hollins volunteered that she and Gooden, while waiting for their flight in Miami, had been talking to a gentleman they had just met when police officers approached and questioned the man.

Mathewson explained that he and Burkhalter were looking for narcotics passing through the airport and asked if the women would consent to a search of their luggage and persons. Both women agreed. Reentering the terminal, Gooden stated that she needed to go to a restroom. Agent Mathewson requested that she wait until the searches were completed, explaining that if no drugs were found the process would only take a few minutes. Gooden first agreed, but after entering the police precinct office and being advised of her right to allow or refuse to allow a search, Gooden insisted upon going to the restroom. She went, accompanied by Agent Mathewson and two female security guards. As she was returning, Gooden dropped a white sock which was found to contain a substantial quantity of cocaine. A smaller quantity of cocaine was discovered in Hollins' purse by Detective Burkhalter.

Agent Markonni, who had remained behind in the gate area, had identified the appellant when Thomas walked down the jetway from the plane to the terminal. Markonni then followed the appellant through the airport; Thomas walked slowly, apparently stopping several times to watch those walking behind him. After hearing a prearranged, paged message indicating that agents had detained the two women in the airport police precinct office, Markonni approached Thomas. Markonni identified himself as a police officer and the appellant agreed to speak with him. Markonni asked the appellant if he had just arrived from Miami and whether he had an airline ticket or any identification. Thomas said that he had no ticket, but he presented his Ohio driver's license. Markonni stated that he was a narcotics officer looking for drugs passing through the airport; the appellant denied that he was carrying drugs, but he agreed to allow Markonni to search his person and his attache case. As they were walking to the police precinct office, Markonni asked if Thomas had been traveling with anyone. The appellant responded that he had traveled alone. Upon entering the office and being confronted with Gooden and Hollins, however, the appellant acknowledged Gooden, saying that she was his girlfriend. Thomas also stated that one of the five pieces of luggage claimed by the women, a clothes bag, belonged to him.

After being told about Gooden's attempt to discard the sock containing the cocaine, Agent Markonni placed Thomas under arrest. The three travelers were then advised of their fifth amendment rights, were booked, and were processed for transportation to a holding facility. As they were waiting to be lodged at the Hapeville City Jail, the appellant turned to the women and said, according to police officers, "we were

set up ... there's no way these guys would have picked us out, out of all those people at the airport. We were set up." [2]

## II. Sufficiency of the Evidence

Thomas first argues that the evidence was insufficient to support his conviction and that the trial court erred in denying his motion for acquittal. He specifically contends that the evidence was insufficient to prove his knowledge of or complicity in the possession of cocaine by his companions.

 It is well settled that an appellate court, in reviewing the sufficiency of the evidence to support a guilty verdict, must view the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Houde*, 596 F.2d 696, 701 (5th Cir. 1979), *cert. denied*, 444 U.S. 965, 100 S.Ct. 452, 62 L.Ed.2d 377 (1980); *United States v. Sink*, 586 F.2d 1041, 148–49 (5th Cir.), *cert. denied*, 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1978). All reasonable inferences from the evidence must be drawn in favor of the jury's verdict. *Glasser v. United States*, 315 U.S. at 80, 62 S.Ct. at 469; *United States v. Houde*, 596 F.2d at 701. In testing the sufficiency of the evidence, the appellate court should reverse the trial court's denial of a motion of acquittal only if "the evidence, viewed in the light most favorable to the Government, is such that a reasonably minded jury *must* have a reasonable doubt as to the existence of the essential elements of the crime charged." *United States v. Barrera*, 547 F.2d 1250, 1255 (5th Cir. 1977).

 For a conviction of conspiracy under 21 U.S.C. § 846, the government must prove the existence of a knowing agreement to act in violation of the narcotics laws. *United States v. Ayala*, 643 F.2d 244 (5th Cir. 1981). Proof of the agreement can be established via direct evidence or upon inferences drawn from relevant and competent circumstantial evidence. *United*

*States v. Houde*, 596 F.2d at 102. In order to demonstrate aiding and abetting within the meaning of 18 U.S.C. § 2, the government must show that the person in some way associated himself with the criminal venture, that he wished to bring it about, and that he sought by his actions to make it succeed. *United States v. Trevino*, 556 F.2d 1265, 1269 (5th Cir. 1977).

 Thomas was first seen in Miami handing money to the persons later found in possession of the cocaine. When approached and questioned by officers, he at first tried to disassociate himself from Gooden and Hollins but changed his story when asked for his ticket. These facts indicate that the appellant assisted the women in obtaining transportation and sought to deceive police officers as to his association with them. Moreover, the appellant's statement made while awaiting processing at the Hapeville jail was strong evidence of guilt. Contrary to the appellant's argument, the evidence concerning his conduct and statements was sufficient for the jury to have reasonably concluded that he was involved with a scheme to transport cocaine to Atlanta. Furthermore, intent to distribute could reasonably have been inferred from the quantity of cocaine found. *See United States v. Vomero*, 567 F.2d 1315 (5th Cir. 1978); *United States v. Mather*, 465 F.2d 1035 (5th Cir.), *cert. denied*, 409 U.S. 1085, 93 S.Ct. 685, 34 L.Ed.2d 672 (1972). Our review of the record thus convinces us that the jury need not have had a reasonable doubt as to the essential elements of both of the offenses with which Thomas was charged. The trial court properly denied the appellant's motion for acquittal.

## III. A Requested "Good Character" Jury Instruction

Thomas filed a written request that the trial court instruct the jury on the weight to be given character evidence. He contends that the trial court's refusal to instruct the jury per his request is reversible error.

2. Thomas admits that he said, "We were set up." The remainder of the statement was dis-

puted at trial.

As Thomas's requested instruction indicated, evidence of good character should be considered together with all the other evidence in a case and may of itself give rise to a reasonable doubt. *United States v. Callahan*, 588 F.2d 1078, 1085 (5th Cir.), *cert. denied*, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979). The law does not, however, invest a defendant with a presumption of good character. *Michelson v. United States*, 335 U.S. 469, 475, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948). The question presented here is whether the evidence Thomas presented was sufficient to entitle him to the instruction he requested.

During his trial, Thomas took the stand in his own defense. In addition to testifying that he had no knowledge of nor part in the transportation or possession of the cocaine, he testified to his lifetime occupation as a musician and stated that he had never been convicted of any crime. On cross-examination, Thomas was asked if he had not told Agent Markonni that he had been convicted in 1977 of the possession of marijuana and fined $200. Thomas' counsel objected and eventually introduced documentary evidence that in 1977 the appellant had paid a $100 fine and plead nolo contendere to the possession of marijuana.

The appellant presented no other witnesses or reputation testimony as to his good character. He contends, though, that his own testimony placed his character in issue and entitled him to the jury instruction which he requested. In support of his position, Thomas cites a reference to "the long-established rule in [the Fifth] Circuit that, when a defendant takes the witness stand to testify in his own defense, he puts his character in issue and the prosecution may attempt to impeach his credibility by presenting evidence of prior convictions of either felonies or crimes involving moral turpitude." *United States v. Garber*, 471 F.2d 212, 215–16 (5th Cir. 1972). Close examination of the context in which this statement was used shows that the court in *Garber* was referring only to the rule that the credibility of a defendant who testifies at his trial may be impeached as the credi-

bility of any other witness could be. *See id.* at 214–16. *See also United States v. Bray*, 445 F.2d 178, 181 (5th Cir. 1971), *cert. denied*, 404 U.S. 1002, 92 S.Ct. 571, 30 L.Ed.2d 555. As this rule suggests, the propriety of a prosecutor's attempt to impeach a defendant appearing as a witness is not dependent upon the defendant's introduction of good character evidence. *Garber*, therefore, does not aid the appellant.

The distinction between introducing good character evidence and subjecting the accused's credibility to impeachment was explained well in *United States v. Walker*, 313 F.2d 236, 238–39 (6th Cir.), *cert. denied*, 374 U.S. 807, 83 S.Ct. 1695, 10 L.Ed.2d 1031 (1963). In that case, the defendant testified in his own behalf, denying his involvement in the transportation of a falsely made security in interstate commerce. He called no other witness. After the defendant rested his case, the government called two rebuttal witnesses who testified that the defendant's general reputation for truth and veracity was bad; the defendant contended on appeal that it was prejudicial error to admit the rebuttal testimony. The Sixth Circuit recognized as "well settled law that in a criminal case the defendant's general character cannot be attacked by the government unless evidence as to his good character is first introduced by the defendant." *Id.* at 238. The court then reasoned that "in the absence of ... character witnesses introduced by the defendant, the government is not entitled to introduce testimony concerning the defendant's bad character." *Id.* (citing *Michelson v. United States*, 335 U.S. 469, 475–79, 69 S.Ct. 213, 218–20, 93 L.Ed. 168 (1948)). Nonetheless, the court held that it was not error for the district court to receive in evidence the testimony that the general reputation of the defendant for truth and veracity was bad. In so doing, the court drew a distinction "between (1) a defendant's general character, such as his reputation in the community wherein he lives for honesty, probity, and being a law-abiding citizen, and (2) his reputation in the community wherein he lives for truth and veracity." 313 F.2d at 238. The court determined that the rule disal-

lowing the introduction of the defendant's bad character by the government "is not applicable when the defendant makes himself a witness and thus makes his reputation for truth and veracity, rather than his character in general, a matter for the jury to consider in determining his credibility as a witness." *Id.* at 238.

As *Walker* makes clear, an accused's testimony subjects his credibility to possible impeachment, but it does not suffice as good character evidence.[3] The distinction explained in *Walker* is often muddled, however, because impeachment evidence reflects upon the credibility of a witness and to that extent reflects upon his character. Opinion and reputation evidence used for impeachment, though, "may refer only to character for truthfulness or untruthfulness." F.R.E. 608(a). In contrast, "when the accused has called character witnesses to testify to his character," the prosecution may come forward with other evidence rebutting good character. J. Weinstein and M. Berger, Weinstein's Evidence ¶ 404[05] (1981). Cases such as *Garber* do speak broadly of a defendant's "putting his character in issue." The distinction explained in *Walker* should be observed, however, and the phrase in *Garber* should not be read to suggest that a defendant's taking the stand entitles him to a good character instruction or allows the prosecution to attack his general character. *See id.*

In sum, we recognize that proof of good character, which is introduced by a defendant to show circumstantially that he is unlikely to have committed the crime for which he is accused, can be accepted by the jury as being sufficient to raise a reasonable doubt. Yet, for this rule to obtain, there must be some evidence of good char-

acter. In this case, Thomas offered none. He did, however, take the stand, so the government was properly allowed to assault his credibility by introducing a prior inconsistent statement in an attempt to cause the jury to disbelieve Thomas's testimony. The court did not err by refusing to give a good character instruction.

**IV. The Admissibility of Testimony Concerning Street Value**

Thomas stipulated at trial that the "quantity of cocaine is a quantity sufficient that it would have been subject to distribution on the part of anyone who would be shown to have had it." The appellant contends that because of the stipulation, the trial court erred in admitting the testimony of a detective concerning such things as the street value of the cocaine seized from Barbara Gooden. He asserts that the stipulation could have given rise to the inference of intent to distribute and contends that the stipulation thus precluded the introduction of other evidence of intent. Thomas further argues that the only possible purpose or effect of the testimony which the government introduced, as well as the jury instruction pertaining to the testimony, was to prejudice and inflame the minds of the jurors.

*United States v. Grassi*, 602 F.2d 1192, 1195–97 (5th Cir. 1979), *vacated and remanded on the other grounds*, 448 U.S. 902, 100 S.Ct. 3041, 65 L.Ed.2d 1131 (1980), sets forth the proper approach for appellate review of a trial court's decision to admit a party's evidence despite the opposing party's offer to stipulate to the issue on which the evidence is offered. That analysis is not triggered, however, by the facts before us in this case.[4]

---

**3.** The issues presented in *Walker* and in this case are different. Nevertheless, the distinction drawn in *Walker* is relevant here because the type of character evidence which must be introduced by a defendant in order for the prosecution to come forward with evidence rebutting good character is the same type of evidence upon which a defendant's entitlement to a good character instruction depends.

**4.** *Grassi* analyzes the admission of evidence under the framework of F.R.E. 403, which always allows evidence to be "excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." By stating that the *Grassi* analysis does not apply, we mean only that consideration of the stipulation as a factor in the Rule 403 balancing process—

■ The record shows that the appellant's offered stipulation only concerned the quantity of cocaine and that the government accepted the stipulation on that basis. There was no offered stipulation of intent to distribute. It is true that intent to distribute a controlled substance *may* be inferred solely from possession of a large amount of the substance, *United States v. Grayson*, 625 F.2d 66 (5th Cir. 1980), but a jury is not *required* to draw such an inference. For that reason, the government was entitled to introduce other circumstantial evidence bearing on the issue of intent, and the trial court properly admitted the detective's testimony.

### V. The Use of Expert Testimony

■ Lastly, the appellant argues that the trial court erred in allowing special agent Paul Markonni to testify as an expert by applying his knowledge of the modus operandi of drug couriers to the facts here in order to explain the significance of the appellant's behavior. We note that whether Markonni was qualified as an expert is essentially a factual determination that will be sustained unless clearly erroneous. *Crawford v. Worth*, 447 F.2d 738, 740–41 (5th Cir. 1971). *See also United States v. Daniels*, 572 F.2d 535, 541 (5th Cir. 1978). We also note that in federal courts, law enforcement officials have been allowed to testify as experts in order to establish the modus operandi of particular crimes. *See, e.g., United States v. Masson*, 582 F.2d 961, 964 (5th Cir. 1978) (the meaning of terminology used in bookmaking operation); *United States v. Scavo*, 593 F.2d 837, 843 (8th Cir. 1979) (method and language used in bookmaking operations); *United States v. Jackson*, 425 F.2d 574, 576 (D.C.Cir.1970) (modus operandi of pickpockets) *see also United States v. Johnson*, 575 F.2d 1347 (5th Cir. 1978) (lay person allowed to testify as demonstrated by *Grassi*—is not required in this case.

5. While Markonni was being qualified as an expert, a portion of his testimony concerned the behavior of suspected drug couriers. That area appears to be more in the nature of expert testimony than evidence of qualification.

as to identity and source of marijuana). Here, though, we need not decide whether a witness can ever be qualified as an expert on the activities of drug couriers or whether Markonni was sufficiently qualified.

The record shows that the objections raised at trial fall into two categories. The first area of objection was directed to the court's decision to allow a witness's law enforcement experience in drug courier interdiction programs to qualify the witness to testify as an expert. The other group was directed to specific questions which the prosecutor asked in order to elicit opinion testimony from Markonni as an expert.

■ Allowing proof of extensive experience in a certain area in order to qualify the witness to give expert testimony in that area—the ruling to which the first type of objection was directed—would be harmless, even if erroneous, unless the witness later testified to conclusions as an expert.[5] A recitation of experience would ordinarily be admissible as the background of any witness. The crucial focus, then, is on the testimony which the court allowed Markonni to introduce *as an expert*. In this case, there was only a single question that might be considered to have been taken as the opinion of an expert. Other attempts by the government to elicit "expert" opinions concerning the significance of the appellant's behavior were successfully opposed by the appellant. The remainder of Markonni's testimony was factual. The error, if any, in allowing expert testimony was harmless.

### VI. Conclusion

Thomas raises no error that would lead us to reverse the trial court. Accordingly, his conviction is

AFFIRMED.

There was, however, no objection specifically raised as to the type of evidence being introduced to qualify Markonni as an expert. Moreover, the appellant's brief does not suggest that such testimony is being urged as a ground for appeal.